## FUSSELL *v.* GREGG & others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

Argued January 8, 9, 1885.—Decided February 2, 1885.

A Court in Equity has no jurisdiction over a suit based upon an equitable title to real estate, unless the nature of the relief asked for is also equitable.

A court of the United States sitting in equity, cannot control the principal surveyor of the Virginia military district in the discharge of his official duties ; or take charge of the records of his office ; or declare their effect to be other than what appears on their face.

The plain meaning of the act of March 23, 1804, 2 Stat. 274, to ascertain the boundaries of the Virginia Military District in Ohio, is, that a failure within five years to make return to the Secretary of War of the survey of any tract located within the Territory, made previous to the expiration of the five years, should discharge the land from any claim founded on such location and survey and extinguish all rights acquired thereby.

The series of acts relating to this District, beginning with the act of March 23, 1804, and ending with the act of July 7, 1838, 5 Stat. 262, as revived and continued in force by later acts, are to be construed together, and as if the third section of the act of March 23, 1804, had been repeated in every act of the series.

The act of March 3, 1855, 10 Stat. 701, allowing persons who had made entries before January 1, 1852, two years time to return their surveys, did not apply to those who had made both entries and surveys before the latter date.

The land office referred to in § 2 of the act of May 27, 1880, 21 Stat. 142, relating to the Virginia Military District in Ohio is the General Land Office.

On the pleas and issues in this cause, the complainant has failed to make good the case stated in the bill.

The facts which make the case are stated in the opinion of the court.

*Mr. Jeremiah Hall* for appellant cited *Galt* v. *Galloway*, 4 Pet. 332; *United States* v. *Stone*, 2 Wall. 525; *Shipp* v. *Miller*, 2 Wheat. 316; *Stephens* v. *McCargo*, 9 Wheat. 502; *The Aurora*, 7 Cranch, 382; *The Anne*, 7 Cranch, 569; *Peck* v. *Pease*, 5 McLean, 486; *Satterlee* v. *Matthewson*, 2 Pet. 380; and the United States Land Laws.

*Mr. William Lawrence* filed a brief for appellees, citing the acts of Congress and of Virginia relating to Virginia Military Lands in Ohio; *Galt* v. *Galloway*, 4 Pet. 332; *Hart* v. *Cregg*, 32 Ohio St. 502; *Latham* v. *Oppy*, 18 Ohio, 104; *Jackson* v. *Clark*, 1 Pet. 628; *Reckner* v. *Warner*, 22 Ohio St. 275; *Stubblefield* v. *Boggs*, 2 Ohio St. 216; *Dresback* v. *McArthur*, 7 Ohio, Part 1, 146; *Harlan* v. *Thatcher*, 18 Ohio, 48; *Thomas* v. *White*, 2 Ohio St. 540; *Weaver* v. *Froman*, 6 J. J. Marsh, Ky. 213; *Dixon* v. *Caldwell*, 15 Ohio St. 412; *Chinn* v. *Trustees*, 32 Ohio St. 236; *Hager* v. *Reed*, 11 Ohio St. 625, 635; *Clark* v. *Southard*, 16 Ohio St. 408; *Walker* v. *Knight*, 12 Ohio St. 209; *Slater* v. *Cave*, 3 Ohio St. 80; *Clark* v. *Potter*, 32 Ohio St. 49; *Whitney* v. *Webb*, 10 Ohio, 513; *Carey* v. *Robinson*, 13 Ohio, 181; Congressional Documents, House Mis. Doc. No. 10, 2d Session 47th Congress, November 16, 1882, and House Mis. Doc. No. 42, 1st Session 47th Congress. June 23, 1882; which documents Mr. Lawrence said had been prepared by him and contained much information on Virginia military land titles in Ohio.

Mr. Justice Woods delivered the opinion of the court.

This was a bill in equity, filed November 20, 1879, to establish the title of the plaintiff to, and recover the possession of, a certain tract of land in the County of Logan, in the State of Ohio, and for an account of rents and profits. Filling the many blanks left in the bill by resort to the evidence, the case made thereby was substantially as follows:

On July 19, 1822, warrant No. 6,508 for 200 acres of land was granted by the State of Virginia to the grandfather of the plaintiff, Archibald Gordon, late of Cecil County, Maryland, in consideration of his services as a private in the Virginia line on

the Continental establishment in the War of the Revolution. On January 21, 1823, he caused his warrant to be located by entry No. 12,017 in the Virginia Military District in the State of Ohio, and the entry to be duly recorded. On March 25, 1823, he caused the entry to be surveyed by Thomas J. McArthur, a deputy surveyor of said military district, and on November 5, 1824, he had the survey recorded in the office of the principal surveyor of the district. Archibald Gordon died intestate about the year 1829, leaving Archibald Gordon, Jr., late of Baltimore, Maryland, his only child and heir-at-law. Archibald Gordon, Jr., died intestate about the year 1833 or 1834, leaving the plaintiff and her sister, Sarah Priscilla Gordon, his only children and heirs-at-law. The plaintiff, on October 31, 1854, intermarried with Joseph B. Fussell, who died December 6, 1864, and the plaintiff's sister, Sarah Priscilla, having intermarried with one William H. Kelly, died intestate on May 12, 1853, leaving issue one daughter, her only child, Mary Elizabeth Kelly. William H. Kelly died at a date not mentioned, leaving his daughter, Mary Elizabeth, surviving him, who died at the age of 9 years 6 months and 3 days without issue, leaving the plaintiff her sole heir-at-law. The plaintiff claimed that by direct inheritance from her father, Archibald Gordon, Jr., and collateral inheritance from her niece, Mary Elizabeth Kelly, she was seized of an equitable estate in fee in the lands covered by survey 12,017, and entitled to the immediate possession thereof.

It was further alleged that on October 4, 1851, Daniel Gregg, one of the defendants, made an entry on the records of the principal surveyor of the district, No. 16,070, of 130 acres on military warrant No. 442, and on December 20, 1851, he procured one hundred acres of his entry to be so surveyed as to cover one hundred acres of land appropriated by the entry and survey of Archibald Gordon, No. 12,017, and on November 2, 1855, he caused the survey to be recorded, and on November 20, 1855, obtained a patent of that date for the lands described in this survey. The bill further averred that the entry, survey, and patent of Gregg were all made and obtained in violation of the proviso of section 2 of the act of March 1, 1823, entitled

"An Act extending the time for locating Virginia military land warrants, and returning surveys thereon to the General Land Office," 3 Stat. 772, and were, therefore, null and void, and never appropriated any land or vested any title in Gregg as against the plaintiff, or those under whom she claimed.

It was further alleged that the defendant, Eleazer P. Kendrick, being the principal surveyor of the Virginia Military District, and in possession of the records of that office, did, subsequently to the entry and survey of Gregg, without the knowledge or consent of plaintiff, or of any person under whom she claimed title, write in the margin of the record of Archibald Gordon's entry the word "withdrawn," and in and across the plat and record of the survey thereof the words "State line," and that Kendrick refused to give the plaintiff a duplicate of said survey to enable her to obtain a patent for the land described therein.

Daniel Gregg, Eleazer P. Kendrick, William Swissgood, Emily Swissgood, Francis Higgins, John W. Higgins, Angeline Higgins, Matilda Higgins, James Eaton, W. G. Smithson and Andrew Murdock were made defendants to the bill of complaint, the bill alleging that the defendants, except Gregg and Kendrick, wrongfully kept the plaintiff out of possession of the premises sued for, claiming title under Gregg. The prayer of the bill was, that the validity of the entry and survey of Gordon might be affirmed and established, and the entry, survey, and patent of Gregg declared void; that the words "withdrawn" and "State line" might be adjudged to have been written upon the record of the Gordon entry and survey without authority; that the plaintiff might be put in possession of the premises sued for, and have an account of rents and profits, and for general relief. Daniel Gregg, Francis Higgins, John W. Higgins, Angeline Higgins and Matilda Higgins, by plea, and the other defendants, except Kendrick, by answer, denied the title of the plaintiff, and set up the limitation of twenty-one years prescribed by the statute of Ohio, in bar of the relief prayed by the bill. Kendrick made no defence. Upon final hearing upon the pleadings and evidence the Circuit Court dismissed the bill, and the plaintiff appealed.

We think that the averments of the bill do not entitle the plaintiff to relief. Her case, as alleged, is, that she has an equitable estate in fee in the premises in dispute, and that the defendants, except Gregg and Kendrick, are in possession without title; in other words, are naked trespassers. The theory of her bill seems to be that, because she has an equitable title only, and for that reason could not recover in an action at law, a court of equity has jurisdiction of her case. But this is plainly an error. Mr. Justice Bradley, in *Young* v. *Porter*, 3 Woods, 342. To give a court of equity jurisdiction, the nature of the relief asked must be equitable, even when the suit is based on an equitable title. The plaintiff does not allege that the defendants, who are in possession of the premises, have the legal title, or that they obtained possession under any person who had it. Nor does she state any facts which connect them with her equity. They being mere naked trespassers, in possession, she prays that they may be turned out of, and she, who has only an equitable title, may be put in possession. The relief prayed for is such as a court of law is competent to grant, if the plaintiff's title would justify it. But the plaintiff does not seek by her bill to better her title. If all the relief asked for were granted, she would still have an equitable title only. The case is, therefore, an ejectment bill brought on an equitable title. In these respects it is similar to the bill in the case of *Galt* v. *Galloway*, 4 Pet. 332. That was a bill in equity brought by the heirs of James Galt for general and special relief against Galloway, Baker, Patterson, and others, setting up title to one thousand acres of land in the Virginia Military District in Ohio, based upon an entry and survey in the name of James Galt. Baker and Patterson were in possession of six hundred acres of the land, claiming title in the name of Galt. The court found that Baker and Patterson had no title to the lands held by them, and upon this state of case said: " These occupants can be considered in no other light by the court than intruders; and the remedy against them is at law and not in chancery. "No decree could be made against them, unless it be that they should deliver possession of the premises; and to obtain this the action of ejectment is the appropriate remedy." Page 339.

This decision is in point, and shows the bill to be without equity as to those of the defendants who are in possession. Their possession is good against all the world except the true owner. As the bill asserts no equity against them, they have the right to stand on their possession until compelled to yield to the true title, and to demand a trial by jury of the question whether the plaintiff has the true title. The plaintiff cannot deprive them of that right by neglecting to acquire the legal title, and upon the ground of her equitable title, ask the aid of a court of equity. She can turn the defendants out of possession only upon the strength of the legal title, which she must first acquire. Having done this, a court of law is the proper forum in which to bring her suit. *Hipp* v. *Babin*, 19 How. 271; *Parker* v. *Winnipiseogee Manufacturing Co.*, 2 Black, 545; *Grand Chute* v. *Winegar*, 15 Wall. 373; *Lewis* v. *Cocks*, 23 Wall. 466; *Killian* v. *Ebbinghaus*, 110 U. S. 568.

As to the defendant Kendrick, it is clear that a court of the United States, sitting in equity, cannot control him in the discharge of his duties as principal surveyor, or take charge of the records of his office, or declare their effect to be other than what appears upon their face.

But we are also of opinion that, upon the issues raised by the pleas and answers, the plaintiff has failed to make good the case which she has stated in her bill. The pleas and answers denied that the plaintiff had, as she averred, an equitable estate in fee in the lands described in the bill.

We think that this defence is established by the facts; that by reason of the failure of Archibald Gordon, or his legal representatives, to make return of the survey to the General Land Office within the time prescribed by the several acts of Congress on that subject, the entry and survey became vacated, annulled and void, and the lands covered thereby became released from such entry and survey. So that the plaintiff, at the time of bringing her suit, was without any interest or estate in the lands described in her bill.

The lands in controversy are within what is known as the Virginia Military District in the State of Ohio. The State of Virginia claimed title to a large territory northwest as well as

southeast of the Ohio River, by virtue of a grant to the Colony of Virginia made by King James I. of Great Britain, on May 23, 1609. The Virginia Military District is within the limits of this grant. The State of Virginia, by an act of its legislature, passed in October, 1779, 10 Hening's Stat. 159, provided for bounty in lands to the officers and soldiers of Virginia in the Revolutionary War, both in what was designated as the Continental and State establishment, and prescribed the quantity to which they were respectively entitled. Other acts of the legislature provided for the issue of land warrants to those entitled to them, 10 Hening's Stat. 50, and prescribed how they might be located, 11 Hening's Stat. 353. On March 1, 1784, the delegates of the State of Virginia to the Congress of the United States, being authorized thereto by an act of the legislature passed December 20, 1783, 11 Hening's Stat. 326, conveyed to the United States all the lands which the State of Virginia owned or claimed northwest of the Ohio River. See deed of cession, 11 Hening's Stat. 571.

The cession was made subject to certain reservations and conditions, among which was the following: "That in case the quantity of good land on the southeast side of the Ohio, upon the waters of the Cumberland River, and between the Green River and Tennessee, which has been reserved by law for the Virginia troops on the Continental establishment, should, from the North Carolina line bearing in further upon the Cumberland lands than was expected, prove insufficient for their legal bounties, the deficiency should be made up to the said troops in good lands to be laid off between the rivers Scioto and Little Miami on the northwest side of the River Ohio, in such proportions as have been engaged to them by the laws of Virginia."

This court, in the case of *Jackson* v. *Clark*, 1 Pet. 628, speaking by Chief Justice Marshall, construed this reservation to be "not a reservation of the whole tract of country lying between the rivers Scioto and Little Miami. It is a reservation of only so much of it as may be necessary to make up the deficiency of good lands in the country set apart for the officers and soldiers of the Virginia line on the Continental establishment southeast of the Ohio," and declared that the residue of the lands was

ceded as a common property for, the use and benefit of the members of the Confederation ; and this trust was to be executed by a faithful and bona fide disposition of the land for this purpose.

As an inference from these views, the court further held that it was within the power of Congress to prescribe the time within which the lands to be appropriated by those holding the bounty warrants should be separated from the general mass, so as to enable the government to apply the residue, which it was then supposed would be considerable, to the other purposes of the trust, and if the time within which the warrants might be located was extended by Congress, it had the right to annex conditions to the extension.

Congress, in the exercise of these powers, which, in the case just cited, it was subsequently decided it possessed, on March 23, 1804, passed an act entitled "An Act to ascertain the boundary of the lands reserved by the State of Virginia, northwest of the river Ohio, for the satisfaction of her officers and soldiers on Continental establishment, and to limit the period for locating the said lands." 2 Stat. 274. Section 1 of this act defined the boundary of the Virginia Military District in Ohio. Section 2 provided :

"That all the officers and soldiers, or their legal representatives, who are entitled to bounty lands within the above-mentioned reserved territory, shall complete their locations within three years after the passing of this act, and every such officer and soldier, or his legal representative, whose bounty land has or shall have been located within that part of the said territory to which the Indian title has been extinguished, shall make return of his or their surveys to the Secretary of the Department of War within five years after the passing of this act, and shall also exhibit and file with the said Secretary, and within the same time, the original warrant or warrants under which he claims, or a certified copy thereof, under the seal of the office where the said warrants are legally kept ; which warrant, or certified copy thereof, shall be sufficient evidence that the grantee therein named, or the person under whom such grantee claims, was originally entitled to such bounty land ; and every person

entitled to said lands and thus applying, shall thereupon be entitled to receive a patent in the manner prescribed by law."

The third and last section provided : " That such part of the above-mentioned reserved territory as shall not have been located, and those tracts of land within that part of the said terrritory to which the Indian title has been extinguished, the surveys whereof shall not have been returned to the Secretary of War within the time and times prescribed by this act, shall thenceforth be released from any claim or claims for such bounty lands."

The plain meaning of the act is that a failure within five years after its passage to make return to the Secretary of War of the survey of any tract of land located within said territory, made previous to the expiration of said five years, should discharge the land from any claim founded on such location and survey, and extinguish all right, title, and estate previously acquired thereby ; and that all lands within said district not located within the same period, should be released and discharged from the right of any person to locate a military warrant thereon. The survey of the entry of Archibald Gordon has, to this day, never been returned to the Secretary of War or, as provided by subsequent acts, to the General Land Office of the United States. His right to the lands covered by his entry and survey was therefore cut off by the act of March 23, 1804, unless it has been saved by subsequent legislation of Congress. Counsel for plaintiff not denying that such was the effect of the act of March 23, 1804, insists that the period limited for returning the survey has been, from time to time, so prolonged that the entry and survey of Gordon are now valid and subsisting, and vest in the plaintiff, as the sole heir of Gordon, an equitable estate in the lands covered by the survey.

This legislation will now be noticed. The act which first followed the law of 1804 was that approved March 2, 1807, 2 Stat. 424. It allowed the officers and soldiers who were entitled to bounty lands in the Virginia Military District a further time of three years from March 23, 1807, to complete their locations, and five years from the same date to return

their surveys and warrants to the office of the Secretary of War. The act also contained the following proviso: "that no locations, as aforesaid, within the above mentioned tract, shall, after the passing of this act, be made on tracts of land for which patents had previously been issued, or which had been previously surveyed, and any patent which may nevertheless be obtained for land located contrary to the provisions of this section, shall be considered as null and void."

The period of limitation prescribed by the act of March 23, 1804, for making locations and returning surveys was subsequently, from time to time, extended by successive acts of Congress. Act of November 3, 1814, 3 Stat. 143; Act of February 22, 1815, 3 Stat. 212; Act of April 11, 1818, 3 Stat. 423; Act of February 9, 1821, 3 Stat. 612; Act of March 1, 1823, 3 Stat. 772; Act of May 20, 1826, 4 Stat. 189. These acts, except that of February 22, 1815, 3 Stat. 212, all contained and repeated the proviso above recited of the act of March 2, 1807.

Congress having established by the act of April 25, 1812, 2 Stat. 716, a General Land Office, the act of November 3, 1814, provided for the return of the surveys and warrants to that office instead of to the Secretary of War, and in this respect was followed by the subsequent statutes, except the act of February 22, 1815, which contained no direction in respect to the return of surveys and warrants.

The act of May 20, 1826, extended the time for making locations to June 1, 1829, for making surveys to June 1, 1832, and for returning surveys to June 1, 1833. After the expiration of the term limited by this act an interval of five years occurred, during which no authority existed for making locations, surveys, or returns of surveys.

The act of July 7, 1838, 5 Stat. 262, extended the time for making locations and surveys, and the return of surveys to the General Land Office, to August 10, 1840, and provided as follows: "That all entries and surveys which may have heretofore been made within the said reservation in satisfaction of any such warrants on lands not previously entered or surveyed, or on lands not prohibited from entry and survey, shall be held

to be good and valid, any omission heretofore to extend the time for making of such entries and surveys to the contrary notwithstanding." It also contained the proviso of the act of March 2, 1807, above recited.

By an act approved August 19, 1841, 5 Stat. 449, the act of July 7, 1838, was "revived and continued in force" until January 1, 1844, and by an act approved July 29, 1846, 9 Stat. 41, the act of August 19, 1841, was "revived and continued in force" until the first day of January, 1848. On July 5, 1848, 9 Stat. 244, a like act was passed, by which the act of August 19, 1841, was "revived and continued in force until January 1, 1850." And by an act passed February 20, 1850, 9 Stat. 421, the same act of July 5, 1848, was revived and continued in force until January 1, 1852.

The effect of the series of acts, beginning with the act approved August 19, 1841, and ending with the act of February 20, 1850, was to continue in force the act of July 7, 1838, till January 1, 1852. The whole series, beginning with the act of March 23, 1804, and ending with the act of July 7, 1838, as revived and continued in force by the later acts just referred to, relates to the same subject and is to be construed together. *The United States* v. *Freeman*, 3 How. 556; *Rex* v. *Loxdale*, 1 Burr. 445, 447. It appears, even from a cursory reading, that § 3 of the act of March 23, 1804, was not repealed or modified, either directly or indirectly, by any of the subsequent acts above mentioned. There was no direct repeal of the section. Neither was there any repeal by implication. *McCool* v. *Smith*, 1 Black, 459; *United States* v. *Tynen*, 11 Wall. 88; *Henderson's Tobacco*, Ib. 652; *Murdock* v. *Memphis*, 20 Wall. 590; *Red Rock* v. *Henry*, 106 U. S. 596. It was allowed to remain unaltered on the statute book; the effect of the subsequent legislation being only to suspend its operation until the first day of January, 1852. The interpretation must, therefore, be the same as if the third section of the act of March 23, 1804, had been repeated in every subsequent statute of the series. As neither Archibald Gordon, nor any of his heirs or representatives, ever made a return of the survey of the land in dispute, either to the Secretary of War, or the Commissioner of the General

Land Office, either before or after the first day of January, 1852, the third section of the act of March 23, 1804, cuts up by the ro ts all the right and title derived from the location and survey of Archibald Gordon.

Under the acts of Congress, Gordon, by his entry and survey, acquired title depending on his performance of certain prescribed conditions. His failure to perform the conditions stripped him of all interest or estate in the lands covered by his entry and survey.

That such is the effect of the third section of the act of March 23, 1804, is made manifest by the proviso above quoted of the act of July 7, 1838, which declared all entries and surveys theretofore made to be good and valid, notwithstanding any omission by Congress to extend the time for making such entries and surveys. This is equivalent to a declaration by Congress that § 3 of the act of 1804 was still in force, and legislation was necessary to relieve from its operation entries and surveys not made within the time limited by that or the subsequent enactments.

Since the act of February 20, 1850, Congress has passed two acts, on both of which the plaintiff relies as making good her title. The first of these is the act of March 3, 1855, 10 Stat. 701, entitled "An act allowing the further time of two years to those holding land by entries in the Virginia Military District in Ohio which were made prior to the first of January, 1852, to have the same surveyed and patented." This act provided "that the officers and soldiers of the Virginia line of Continental establishment, their heirs or assigns, entitled to bounty lands which have, prior to the first day of January, 1852, been entered within the tract reserved by Virginia between the Little Miami and Scioto rivers, for satisfying the legal bounties to her officers and soldiers upon Continental establishment, should be allowed the further time of two years from and after the passage of this act to make and return their surveys and warrants, or certified copies of warrants, to the General Land Office."

This act is by its terms confined to lands entered and not surveyed prior to January 1, 1852. The policy of the act is

clear.   The acts passed prior to the act of July 7, 1838, fixed one period for locating entries and a longer time for making and returning surveys, plainly because the surveys could not be made until the entries were made.   But the act of July 7, 1838, as revived and continued in force by subsequent statutes, fixed the first day of January, 1852, as the limit allowed both for making entries and making and returning surveys.   It therefore doubtless happened that laggard warrant holders procrastinated the making of their entries until it was too late to make and return their surveys before the first of January, 1852.   Therefore the act of March 3, 1855, was passed allowing the holders of warrants, who had made their entries before January 1, 1852, two years further time after the passage of the act to make and return their surveys.   Those who before January 1, 1852, had made both their entries and surveys were not within the words or spirit of the act.

The next act on which the plaintiff relies is the act of May 27, 1880, 21 Stat. 142.   This act is entitled "An Act to construe and define 'An Act to cede to the State of Ohio the unsold lands in the Virginia Military District in said State' approved February 18, 1871, and for other purposes."   The act which was to be construed and defined provided " that lands remaining unsurveyed and unsold in the Virginia Military District in the State of Ohio, be, and the same are hereby, ceded to the State of Ohio," and saved to any *bona fide* settler not exceeding one hundred and sixty acres by him occupied by his pre-empting the same in such manner as the State of Ohio might direct. 16 Stat. 416.

The plaintiff relies on the first three sections of the act of May 27, 1880.   The first section declares that the true intent and meaning of the act of February 18, 1871, just mentioned, was to cede to the State of Ohio only such lands as were unappropriated and not included in any entry or survey within said district founded on military warrants upon Continental establishment.

The second section is as follows:  " That all legal surveys returned to the land office on or before March third, eighteen hundred and fifty seven, on entries made on or before January

first, eighteen hundred and fifty-two, and founded on unsatisfied Virginia military Continental warrants, are hereby declared valid."

The third section provided that the officers and soldiers of the Virginia line on Continental establishment, their heirs or assigns, "entitled to bounty lands which have, on or before January first, eighteen hundred and fifty-two, been entered." in the Virginia Military District in Ohio, should be allowed three years after the passage of the act to make and return their surveys for record to the office of the principal surveyor of said district, and might file their plats, and certificates, warrants, or certified copies of warrants, at the General Land Office, and receive patents for the same.

The provisions of the third section are based on the same policy, and are similar to those of the act of March 3, 1855, *ubi supra,* and must receive the same construction, namely, that three years further time was allowed for the return of the surveys of the land which had been entered but not surveyed before January 1, 1852. The section does not, therefore, help the plaintiff's title.

But the plaintiff relies confidently on the second section, and her contention is, that the "land office" referred to in this section is the same as the "office of the principal surveyor of said," the Virginia military, "district" mentioned in the third section of the act, and that, as on November 25, 1824, Archibald Gordon had recorded his survey in the latter office, kept at Chilicothe, Ohio, the section above quoted makes the survey valid.

In construing the second section of the act of 1880, the rule already referred to must be applied, namely, that all acts in relation to the same subject are to be construed together as if one act. The act of 1880 is part of the system of legislation relating to the Virginia Military District in the State of Ohio, beginning with the act of March 23, 1804, and continued in the fourteen other acts heretofore referred to. The acts of March 23, 1804, and of March 2, 1807, passed before the establishment of the General Land Office, required surveys to be returned to the Secretary of War. All the subsequent acts,

except the act of February 22, 1815, which omitted any direction for the return of surveys, fourteen in number, either directly or by reference to other acts, required surveys to be returned to the General Land Office. When, therefore, the second section, of the act of May 27, 1880, provides that all legal surveys returned to the "land office" before March 3, 1857, shall be valid, it is not open to question that the land office referred to is the General Land Office. In all the legislation on the subject, found in thirteen acts of Congress, extending over a period of sixty-eight years, no other land office had been mentioned. The theory that the words "land office," in the act of May 27, 1880, meant the office of the principal surveyor of the District of Chilicothe, which, in all the previous legislation had never been named or alluded to, is without any support in any rule of construction, and is inconsistent with the system for the disposition of the lands adopted and maintained by Congress for more than three-quarters of a century. That system, as we have seen, required the surveys and warrants to be returned to the city of Washington, at first to the Secretary of War, and afterwards to the General Land Office. It required that patents should be issued by the President upon surveys so returned, and no patent could issue on any survey not so returned. It cannot be conceived that Congress, by the omission of the word "general" before the words "land office," intended to reverse this policy which it had persistently adhered to through fifteen different statutes and for nearly three generations, and thus to unsettle the titles to land in a large and densely peopled territory.

Nor can we impute to Congress the incongruity of using the words "land office," and the words "the office of the principal surveyor of said district," in contiguous sections of the same act, to mean the same thing. But all doubt, if any existed, of the true meaning of the words "land office" in the section under consideration is removed by the fact that the section is plainly in substance and effect a re-enactment of the act of March 3, 1855, which provided in terms for the return of surveys to the General Land Office.

The plaintiff further insists that the first and second sec-

tions of the act of May 27, 1880, repeal, by implication, the third section of the act of March 23, 1804. There is no ground for such a contention. It is most unreasonable to suppose that Congress intended, by doubtful inference, to repeal the salutary provision of section 4 of the act of 1804, which, in numerous enactments, it had cautiously preserved for a period of seventy-six years, and on which the titles to a vast domain rested.

The object of the first and second sections of the act of May 27, 1880, was not to confer new rights, but to preserve rights already vested, from impairment by any construction which might be placed on the act of February 18, 1871, by which the unsurveyed and unsold lands in the Virginia Military District were ceded to the State of Ohio.

But it is enough to say that there is no inconsistency between the two enactments, one of which is said to repeal the other. There can, therefore, be no repeal by implication.

It follows that the plaintiff can derive no aid from any act of Congress passed since the first day of January, 1852. On that day all interest and estate of the heirs of Archibald Gordon in the lands covered by his entry recorded on January 1, 1823, and his survey recorded on November 6, 1824, ceased and determined. The plaintiff, therefore, has failed to make good her averment that she has an equitable estate in fee simple to the premises in controversy. She has, therefore, shown no right to the relief prayed by her bill.

It is immaterial whether the patent of Gregg, under which the defendants claim, was valid or void. The plaintiff, having no title, can have no relief against them. The defendants, being in possession, are entitled to retain possession until ousted by one who has the title. The decree of the Circuit Court, by which the bill was dismissed, was, therefore, right, and is

*Affirmed.*

Fussell v. Hughes, Appeal from the Circuit Court of the United States for the Northern District of Ohio.

The bill in this case was also filed November 20, 1879. It was based on the same alleged title as that in case No. 147, and was

brought for a part of the lands covered by the same entry and survey, and prayed for the same relief. The same defences were pleaded. It follows, from what has been said in the above case, that this suit is not within the jurisdiction of a court of equity, and that the plaintiff has no right whatever to the lands to which she seeks to establish title, and of which she prays to be put in possession. The decree of the Circuit Court by which the bill was dismissed was, therefore, right.

*Decree affirmed.*