Williams, J.
The lands in controversy are situated in the Virginia military district, and it is conceded that the plaintiff has all the title to them which the state acquired by the act of Congress, approved February 18, 1871, which reads as follows:
. “Be it enacted by the Senate and House of Representatives of the United States of America assembled, that the lands remaining unsurveyed and unsold in the Virginia Military District, in the state of Ohio, be and the same are hereby ceded to the state of Ohio, upon the conditions following, to-wit:
“Any person, who, at the time of the passage of this act is a bona fide settler on any portion of land may hold not exceeding one hundred and sixty acres so occupied, by .his preempting the same in such manner as the legislature of the state of Ohio may .direct. ”
One of the questions made is whether the lands in dispute were unsurveyed lands when the act above quoted went into effect. It is claimed by the defendants they were, not,. and therefore, not within the descriptive terms of the.grant to the *577 state. If the determination of the question involved the weight of the evidence we should decline to enter upon its consideration; but it does not, its decision depending entirely upon the effect of certain federal statutes limiting and extending the time for making entries and'making and returning surveys of lands in the Virginia military district. In the cession of the territory northwest of the river Ohio to the United States, by the state of Virginia, there was a reservation of the right to appropriate any of the lands “lying between the Scioto and Little Miami rivers,” by the officers and soldiers of the Virginia military line in the war of the Revolution, on warrants issued to them for their services ; and the United States took those lands subject to that trust. By the act of Congress passed March 23, 1804, “officers and soldiers, or their legal representatives, were required to make their locations within three years and make and return their surveys within five years from the passage of the act.” The act contains the further provision, that all lands within the district which “ shall not have been located, and the surveys whereof shall not have been returned to the Secretary of War within the time and times prescribed by this act shall thenceforth be released from any claim or claims for such bounty lands.” By the subsequent act of March 2, 1807, soldiers having such warrants were “allowed the further time of three years from March 23d next, to complete their locations, and a further time of five years from that date to return their surveys and warrants, or certified copies of warrants to the office of the Secretary of the War Department,” subject, however, to the proviso: “That no locations aforesaid within the above *578 mentioned tract shall, after the passing of this act, be made on tracts of land for which patents had previously been issued, or which had been previously surveyed, and any patent which may, nevertheless, be obtained for land contrary to the provisions of this section shall be considered null and void.”
It was held, in the ease of Jackson v. Clark, 1 Peters, 628, that under the cession of the northwest territory, congress had the power to prescribe the time within which the lands reserved for the Virginia troops should be appropriated to that purpose, and annex conditions to any extension of that time, as was done by the statutes above mentioned, and that all lands not appropriated within the time, and according tp the conditions, were divested of the trust in behalf of such troops, and discharged from their claims ; the general government thereafter, being at liberty to dispose of the lands as a common fund for the states of the Union. As said by Chief Justice Marshall,in that case, the time allowed for making the appropriation “certainly ought to be liberal. But, unless some time might be prescribed, the other purposes of the trust would be totally defeated ; and the surplus land remain a wilderness. ”
By subsequent legislation the time for making entries on warrants issued to the Virginia troops, and for making and returning surveys of the lands entered, was extended from time to time, upon the conditions set forth in the previous statutes, until, by the act of February 20, 1850, the time within which such entries and surveys might be made and returned was limited to January 1,1852. It is not necessary to examine this legislation in detail; it has been considered and construed by the Su *579 preme Court of the United States, by whose decisions it is established that, whatever of these lands “had not been appropriated in accordance with the terms of existing law, so as- to secure to the claimant a legal right to call for a patent, was subject to the disposal of the United States for its own use, and according to its own pleasure. It is in view of this condition of things that the act of February 18,. 1871, must be considered and construed;” and that, “it was essential to the vesting of any interest under an entry and survey within the Virginia military land district, made prior to January 1, 1852, that the survey should be returned to the commissioner of the General land office at Washington, on or before that date, and that the failure to do so discharged the land from any claim founded on such location and survey, and extinguished all right, title and estate previously acquired thereby.” Coan v. Flagg, 123 U. S., 117; Fussell v. Gregg, 113 U. S., 550.
The lands involved in this action were entered upon-Virginia miliary warrants issued for services of Lieutenant Richard Routt, and the. survey was made on the first day of April, 1850, but not returned to the proper office at Washington until after the 1st of January, 1852; so that, the survey, not having been returned within the time limited by the then existing law, was unavailing as an appropriation of the lands included in it, and consequently, they remained unaffected by it, and subject to any disposition the government might choose to. make of them; and, unless that legal status of the land was changed before the grant made to the state by the act of February 18, 1871, took effect, they passed by that grant divested of any claim under the.-entry and survey. Such- *580 change did not occur unless it was effected by the act of March 3, 1855, which provides: “That the officers and soldiers of the Virginia line on continental ' establishments, their heirs or assigns, entitled to bounty lands which have, prior to the 1st day of January, 1852, been entered within the tract reserved by Virginia, between the Little Miami and Scioto rivers, for satisfying the legal bounties to her officers and soldiers upon continental establishments, shall be allowed the further time of two years from and after the passage of this act, to make and return their surveys and warrants, or certified copies of warrants, to the General land office.” This statute, it has been held, has no application to cases where both the entry and survey were made prior to January 1, 1852, but applies only where the entry, but not the survey, was made before that date, allowing the additional time of two years from March 3, 1855, within which to have the survey made and returned. Fussel v. Gregg, supra, also Coan v. Flagg, supra.
Whilst the statute might admit of the more liberal construction, that, as it allows the specified time for both making and returning a survey’, the right to return a survey already made should be regarded as within its spirit and intent, we are not at liberty to adopt that interpretation, or disregard the construction it has received from ¿the Supreme Court of the United States. A construction given to a Federal statute by the highest Federal court, is binding upon the state courts. • In construing this statute, it is said by Mr. Justice Wood, in Fussel v. Gregg: “This act is by its terms confined to the lands entered and not surveyed prior to January 1, 1852.-'The policy of the act is clear. The acts passed *581 prior to the act of July 7,1838, fixed one period for locating entries and a longer time for making and returning surveys, plainly because the surveys could not be made until the entries were made. But the act of July 7, 1838, as revived and continued in force by subsequent statutes, fixed the first day of January, 1852, as the limit allowed both for making entries and making and returning surveys. It therefore doubtless happened that laggard warrant-holders procrastinated the making of their entries until it was too late to make and return their .surveys before the first of January, 1852. Therefore the act of March 3, 1855, was passed allowing the holders of warrants, who had made their entries before January 1, 1852, two years further time after the passage of the act to make and return their surveys. Those who before January 1, 1852, had made both their entries and surveys were not within the words or spirit of the act.”
That case was followed in Coan v. Flagg, where, in the opinion by Mr. Justice Matthews, it is said: “It was decided by this court in the ease of Fussel v. Gregg, 113 U. S., 550, upon a careful and detailed review of all the legislation on the subject, that it was essential to the vesting of any interest under an entry and survey within the Virginia military land district, made prior to January 1, 1852, that the survey should be returned to the commissioner of the General land office at Washington, on or before that date, and that the failure to do so discharged ‘ the land from any claim founded on such location and survey, ’ and extinguished ‘all right, title, and estate previously acquired thereby.’ Such lands might, therefore, very properly be considered. in contemplation of law, as ‘unsurveyed.’ ”
*582 We are not advised of any legislation subsequent to the act of 1855, and prior to that of February 18, 1871, which affects the question here; so that, at the time of the adoption of the latter act, the lands which are the subject of this action, were within the category of unsurveyed lands in the Virginia military district, and included in the terms of the grant thereby made to the state. The state, by an act of its legislature passed March 26, 1872, formally accepted the grant, vested the title to the lands in the Ohio Agricultural and Mechanical College, the name of which has since been changed to that of the Ohio State University, and made provision for the pre-emption of portions of the lands by tona fide settlers, in accordance with the conditions of the grant. In the meantime, namely, on the 27th day of April, 1871, a patent for the lands in dispute was issued to the representatives of Lieutenant Routt, upon the survey which was made, as before stated, prior to January 1, 1852, but not returned until after that date. The defendants, by a chain of intermediate conveyances, connect themselves with that patent, and claim title from no other source; and their principal contention is, that the patent establishes the regularity of all the steps preliminary and necessary to its issuing, 'and is conclusive as to the title, until set aside by a direct proceeding. The soundness of that position, it is manifest, must depend upon whether, when the patent was obtained the title to the lands covered by it was still in the government of the United States. If before that time it had parted with all its title to the lands, of course none was conveyed by the patent; for a patent cannot, any more than the deed of an individual, create title to anything not owned by thé grantor. The *583 question is thus raised, when did the title to the lands ceded by the act of February 18, 1871, vest in the state? Was it when the act took effect, or not until the acceptance of the grant by the state ? If at the former date, the patent could not divest the state’s title, for once vested, it became irrevocable; but if the title did not vest until the passage by the legislature of the act accepting the grant, the state acquired no title to the lands in question, for the reason that, having already been conveyed by the patent they were taken out of the terms and operation of the grant to the state. It is well settled that in construing a congressional grant, “it is to be borne in mind the act by which it is made is a law as well as a conveyance, and such effect must be given to it as will carry out the intent of congress. That intent should not be defeated by applying to the grant the rules of the common law, which are properly applicable only to transfers between private parties. To the validity of such transfers, it may be admitted that there must exist a present power of identification of the land; and that where no such power exists, instruments, with words of present g-rant, are operative, if at all, only as contracts to convey. But the rules of the common law must yield in this, as in all other eases, to the legislative will. ” Railway Co. v. Railway Co., 97 U. S., 491. In that case, by an act of congress, there was granted to a railroad company the alternate sections of land on each side of its line, which were not sold, reserved, or otherwise disposed of. The act provided that upon the completion of every forty miles of the road, commissioners, to be appointed by the president, were to examine the same and report whether it was so completed, and when such reports were made, if *584 favorable, patents were to issue for the sections on each side of the road so completed. The question was whether the title vested in the company at the date of the act, or not until the forty miles of road were constructed and accepted, or only when the patents were issued. In holding that it vested at the date of the act, Mr. Justice Field said: “The language of the act, ‘is that there be and hereby is granted,’ words which import a grant in presentí, and not in futuro, or the promise of a grant;” and further, that when the location of the road was made and the sections granted ascertained, the title of the company “took effect by relation as of the date of the act, except as to the reservations mentioned, so as to cut off all intervening claimants except as to the reservation made.”
In R. R. v. U. S., 92 U. S., 733, it is held that the words ‘ ‘ there be and is hereby granted, ” in an act of congress, are words of absolute donation, and import a grant in presentí/” and it is there said, ‘ ‘ this court has held that they can have no other meaning, and the land department, on its interpretation of them, has. uniformly administered every previous grant.” And again in the case of Van Wyck v Knevals, 106 U. S., 360, in giving construction to a congressional grant which gave to the state of Kansas for the use of the St. Joseph and Denver City railroad company, alternate sections designated by odd numbers, on each side of the proposed road, subject to the condition that if it appear, when the route of the road is ‘definitely fixed,’ that the United States have sold any section or part thereof, or the right of pre-emption or homestead settlement has attached, or the same has been reserved by the United States for any *585 purpose, the secretary of 'the interior shall cause an equal quantity of other lands to be' selected from odd sections nearest those designated in lieu of the lands appropriated, which shall be held by the state for the same purpose, Mr. Justice Field uses the following language: “The grant is one in presentí, except as its operation is affected by that condition; that is, it imports the transfer, subject to the limitations mentioned, of a present interest in the lands designated. The difficulty in immediately giving full operation to it arises from the fact that the sections designated as granted are incapable of identification until the route of the road is ‘definitely fixed.’ When the route is thus established, the grant took effect upon the sections by relation of the date of the act of congress. In that sense we say that the grant is one in presentí. It cuts off all claims, other than those mentioned, to any portion of the lands from the date of the act, and passes the title as fully as though the sections had then been capable of identification. Nor is this operation of the grant affected by the fact that patents of the United States are subsequently, upon certificate of the governor,’ to be issued by the secretary of the interior directly to the company, and not to the state.” And to the same effect is R. R. Co. v. Baldwin, 103 U. S., 426.
Under the well settled rule of construction of congressional grants, that made to this state by the act of February 18, 1871, is a grant in presentí, its language being, “that the lands remaining unsurveyed and unsold in the Virginia military district in the state of Ohio, be and the same are hereby ceded to the state of Ohio.” Its formal acceptance by act of the legislature, or otherwise, *586 is not made a condition to the vesting of the title, and there are no reservations in the act except the right of pre-emption of limited quantities of land by bona ficle settlers. The duty imposed upon the legislature of prescribing the manner of making such pre-emptions is not a condition precedent to the investing of the state with the title to any of the lands embraced in the grant; but it is rather a condition subsequent, the performance of which contemplates the title as being in the state, subject only to the rights of bona fide settlers to make pre-emptions of lands occupied by them not exceeding the quantity allowed by the act. It seems clear, therefore, that on February 18, 1871, when the act of cession to the state took effect, the defendants had no beneficial estate in the lands in controversy, either legal or equitable, and the complete title to them, on that day, vested in the state. It is also clear that its title cannot be defeated or impaired by the subsequently obtained patent under which the defendants claim. The congressional grant to the state was itself a patent, or the equivalent of a patent, and the plaintiff is in the position of a holder of the elder of two conflicting patents, which must prevail over the junior. Nor can the defendants claim the benefit of the rule that when two grants conflict, preference will be given to a junior patent founded on a senior entry, over a senior patent founded on a junior entry, because when the grant to the state took effect there was no subsisting entry or survey upon which to predicate the patent set up by the defendants. And, furthermore, the state was not in the position of a subsequent locator, but as said by Mr. Justice Matthews in Coan v. Flagg, supra, it “was a *587 grantee under the terms of a new law directly from congress itself.”
We do not doubt the rule, in support of which counsel for the defendants have cited many authorities, that in an action of ejectment a patent cannot be assailed for irregularities in obtaining it, or for errors of the officers' charged with the duty of passing upon the sufficiency and regularity of the proceedings to obtain it. Upon all these matters the patent itself is conclusive. But we do not understand that the plaintiff attacks the patent set up by. the defendants, or that it, was necessary to do so, on any of those grounds. When brought forward as a defense to the action, the plaintiff denies that it conveys title to the land described in it, for the sufficient reason that there was none in the government to convey when it was issued ; and it was therefore no impediment to the plaintiff’s recovery. We are not aware that it has been held a patent may not be shown to be void for want of title to the land, or power to convey the same. The contrary doctrine has been frequently maintained. Thus in Doolan v. Carr 125 U. S., 618, it is said, that, where the government “has issued a patent in due form of law which is sufficient on its face to convey the title to the land described in it, such patent is to be treated as valid in actions at law, subject, however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority; if the land they purported to convey had never been within their control, or had been withdrawn from that control, at the time they undertook to exercise such authority, then their act was void.” And the court further says, “that even a patent *588 from the United States issued with all the forms of law, may be shown to be void, by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue.” And other cases announce the same doctrine.
Finally, it is claimed the defendants’ title to the lands in question was confirmed by the acts of congress of May 27, 1880, and August 7, 1882. By the former of these acts it is declared that the true intent and meaning of the act of February 18, 1871, was to cede to the state, of Ohio, only such lands as were unappropriated and not included in any survey or entry; and the latter act provides that persons who have been in possession of any of the lands for twenty .years under claim or color of title based on such entry, shall be deemed the legal owners of the land included in the entry. But here again, whether this claim of the defendants can be maintained, must depend upon whether the title to the lands vested in the state by the act of cession. If, notwithstanding that act, the title remained in the general government, there could be no objection to its making such disposition of them as it should choose to make; and the defendants might well claim their title was assured by the legislation referred to. But if, as we have’ seen is the case, the indefeasible title was vested in the state, the lands ceased to be within the control of congress, and such subsequent legislation could not divest or otherwise affect the state’s title to them, though ceded as a donation, any more than the acts or declarations of any other grantor, after he has parted with his title by valid conveyance, could affect the title of his grantee. If it were otherwise, the cession would amount to a *589 mere revocable license; for it is obvious that if the lands ceded were thereafter subject to congressional control in any respect, they must be in all, and could be wholly withdrawn from the operation of the grant. The purpose and effect of this subsequent legislation was not to- create new rights, but to preserve and protect rights already existing when the act of cession to the state was passed. Under the law applicable to the facts of this case, we are constrained to hold that tire court erred in directing the jury to return their verdict for the defendants.

Judgment reversed.

Bradbury and Burket, JJ., dissent.