FRANCIS F. NEVERMAN, Respondent, *v.* JANE NEVERMAN and Another, Appellants.

Judgment modified by inserting in the 3d paragraph thereof, after the words " in fee simple absolute " the words " subject to the payment of two hundred dollars to Sarah upon her mother's death; " and as so modified affirmed, with costs. Van Kirk, P. J., Hinman, Davis and Hill, JJ., concur; Hasbrouck, J., dissents, with an opinion.

HASBROUCK, J. (dissenting). The defendant, Jane Neverman, in 1901, bought a lot known as No. 626 Chrisler avenue, in the city of Schenectady, Her husband died in 1907 and left her a farm in the vicinity of Schenectady. She had the following children: Francis, the plaintiff, John, Samuel, Sophia, Sarah, Christina and Mary H. Carlson. She executed a will October 30, 1907, giving the farm, implements and stock to Samuel subject to the mortgage thereon and subject to the payment of $50 each to her children. To Francis she gave a lot on Chrisler avenue, subject to the payment by him of $200 to his sister, Sarah L. Wilson. She gave to Christine a piece of land 50 feet front out of the farm; she gave to her son John 350 feet frontage out of the farm; she leased the farm to Samuel for ten years for a home and support and $50 a year and afterward she deeded the farm to Samuel in 1924, subject to a mortgage of $1,600. She made no deed to her son John nor to Mary H. Carlson. In 1923 Jane deeded 47 Wing avenue to her daughter Sophia and deeded No. 626 Chrisler avenue to her daughter Sarah. The plaintiff paid the taxes on No. 626 Chrisler avenue from 1907 to 1911, when he proposed to his mother, the defendant Jane, the sale of the property, which she refused. To meet the carrying charges he then proposed to build upon it. He testifies as follows in regard thereto: " ' Well, maybe we could build a house on the lots,' ands he said, ' I have no money,' and I said I thought I could borrow some money on a bond and mortgage and throw my own labor in and with some money

of my own we could manage to build a house, but that she would have to sign a bond and mortgage, and she said, ' I will sign anything to help you,' and figured it over approximately what the interest would be on a $3,000 mortgage and the possible rent I would get and the approximate taxes, and the street assessments, and I told her it would take all the money to pay the expenses and she said, ' I don't expect anything out of it.' She said, ' If you build that house I don't want anything to do with it, I don't want the worry of it, I want you to see that all the bills are paid,' and she said, ' After I am dead the house is yours.' " The house was built. Jane Neverman broke both her legs in 1910, and was obliged to go to a hospital and have a nurse. Her daughter Sarah was a professional nurse and left her occupation and administered to her mother for seven weeks and expended money in providing her things to eat at the hospital. Twice afterward she was taken sick and Sarah nursed and took care of her until she had recovered. Jane Neverman lived during the summer season on the farm with her son Samuel, and during the winter season in Schenectady with her daughter Sophia. There came a time late in 1922 when she became sick at the farm and she found a refuge in the house of Sarah. Sarah nursed her and took care of her and maintained her down to the time of the trial. It is apparent that Jane told the truth when she said to Francis that she had no money. When she went to Sarah she was old, infirm and indigent. During the eleven years elapsing from 1911 to 1923 Francis had his mother at his house for about two weeks, and paid her $50 a year for eight years commencing 1915. The house about which he represented to her would take all the money to pay the expenses, soon commenced to earn in rentals a surplus of $300. At the time of the trial Francis had received $2,900 more than the expenses. If he shall become the owner of No. 626 Chrisler avenue by virtue of the will of Jane, he will have acquired $1,400 in value above the $2,900, making his enrichment from the venture $4,300. The complaint in the action is to set aside the deed from Jane to her daughter Sarah on the ground of undue influence. The answer of the defendant Jane sets up the Statute of Frauds and a denial of the material allegations of the complaint and asks for an accounting by the plaintiff of the moneys received as rentals from the house. The sole question in the case, it seems to me, is whether in an action for specific performance of the contract the court was warranted in making the decree appealed from. It may be assumed that the contract does not lie within the condemnation of the Statute of Frauds. Defendant Jane in 1907 had made a will devising the land in suit, then valued at $350, to Francis subject to the payment of $200 to his sister Sarah. The will contemplated an equal division between them. When she said, according to the testimony of the plaintiff, " After my death it is all yours," it may be that she referred to the writing and adopted it in connection with the agreement. (*Burns* v. *McCormick*, 233 N. Y. 230.) However, the writing was done long prior to the making of the contract and does not at all comprehend the agreement alleged thereby. (*Mentz* v. *Newwitter*, 122 N. Y. 491; *Ward* v. *Hasbrouck*, 169 id. 407, 411.) The plaintiff claims that by the breach of the contract she became enriched for she kept a property which was worth $1,700 above the amount unpaid on her mortgage of $2,800 reduced to $2,300. Since she contributed $2,800 to the building of the $3,500 house, her enrichment may not be claimed to be unjust. There are controlling reasons why the defendant Jane should not be required to perform the

agreement. The first is that under the confidential relation of mother and son, the plaintiff said to his mother in inducing the contract, it will " take all the rents to pay the expenses." While that may have been an estimate it was untrue and may have influenced her to say, " I want nothing out of it; after I am dead it is all yours." As a man of affairs and a builder it may not be doubted that he knew better. At any rate he later learned that the statement he made was untrue and never informed his mother to the contrary. That enjoying his mother's confidence he abused it in obtaining this contract, is hardly open to dispute. The effect of such misrepresentation is stated in Perry on Trusts and Trustees (vol. 1 [6th ed.], § 173): "A misrepresentatation, however, of a mere matter of opinion may avoid a contract, or convert the fraudulent party into a trustee, where the other party is known to place confidence in the opinions and judgments of the person with whom he is dealing, or where the relations between the parties are of a confidential and fiduciary character, or where one party has peculiar or exclusive means of acquiring proper information upon which to form a judgment or opinion, or where the representations are such that one party is induced to rely upon the opinions of the other." *Second.* The contract contemplated the payment of no consideration to his mother. The $200 required by her will to be paid his sister Sarah was charged upon the land. Thus during the mother's life the contract contemplated no payment of any money to her. *Third.* He knew his mother was indigent and while he profited to the extent of $3,300 all he gave her towards her support was $5 short of $400 during the eight years commencing 1915. The contract must stand unless it be unconscionable. Was it fair and just for the son to lead his mother into a contract by making an untrue estimate of the rental earnings of the proposed building? Was it fair and just to make a contract with her that contemplated no payment of any money to her, poor, old and infirm during her life? What is an unconscionable agreement? It is one such " as no man in his senses * * * would make on the one hand, and as no honest and fair man would accept on the other." (*Hume* v. *U. S.*, 132 U. S. 406, 411–415.) If the son, bound by the faith and confidence of the filial relation, can be held to have been honest, just and fair in taking the contract in suit from his mother then equity has abandoned her prior domain. But when equity is invoked to compel specific performance of a contract, it should be "perfectly fair in all its parts," free from any fraud, misrepresentation even though not fraudulent, "not an unconscionable or hard bargain; and its performance not oppressive upon the defendant." (4 Pom. Eq. Juris. [4th ed.] §§ 1404, 1405.) The action at bar was to set aside a deed for undue influence. Undue influence is a species of fraud. The plaintiff had to have an equitable title based on fraud in the absence of a legal one to support his action. (*Fussell* v. *Gregg*, 113 U. S. 550, 555.) The court was without jurisdiction to appoint the defendant Jane a trustee in the absence of fraud. As has been attempted to be shown, Jane Neverman was not guilty of fraud. She broke her contract but committed no fraud. (*Wheeler* v. *Reynolds*, 66 N. Y. 227, 232; *Burns* v. *McCormick*, 233 id. 230.) The plaintiff's plea should be rejected. The plaintiff, however, is in court and the plea against him is that he should account. His conduct was inequitable and unconscionable. (*Foreman* v. *Foreman*, 251 N. Y. 237, 240; *Sinclair* v. *Purdy*, 235 id. 245; *McCartney* v. *Titsworth*, 119 App. Div. 547; *Leary* v. *Corvin*, 181 N. Y. 222, 229; *Burns* v. *McCormick*, 233 id. 230.) He without warrant and mercilessly has harassed his mother in her old age by suing

her. He should account to her. The decree should be reversed and judgment directed against the plaintiff for an accounting of the rents and profits of the property in suit.