BARR, District Judge.
This suit in equity is brought against the heirs of J. W. South, and also against William Strong, H. C. Duff, and the heirs of Alfred Marcum. The purpose of the suit, according to the allegations of the bill, is to have a partition between the complainant and the heirs of J. W. South of certain lands alleged to be the unsold portion of the land patented to Thomas Franklin by the state of Virginia, on January 26, 1787, and which are alleged to be jointly owned by the complainant and said heirs. The bill, as against the defendants Strong, Duff, and the heirs of Alfred Marcum, is for the purpose of quieting complainant’s title to certain lands therein described, which are alleged to be a part of the unsold land patented to Thomas Franklin in 1787. The bill likewise seeks an injunction to prevent the defendants Strong, Duff, and the heirs of Alfred Marcum from disturbing complainant’s possession or cutting timber on the lands described in the bill, and to recover damages for certain alleged cuttings of saw logs. There is no description of unsold lands in the Franklin patent, except those which are described and alleged to be claimed by the defendants Strong, Duff, and the heirs of Alfred Marcum. The bill is perhaps multifarious, in that it is a bill quia timet, and also for a partition of the unsold lands in the Franklin patent, as between the complainant and the defendants J. W. South’s heirs; but the objection of multifariousness has not been taken, and the case as prepared and now submitted is upon its aspect as a suit quia timet. J. W. South’s heirs have not answered the bill, nor have they been subpoenaed, and it may be assumed that, as the case has been submitted generally, that part of the bill which seeks a partition has been abandoned. The heirs of J. W. South are alleged to be tenants in common with the complainant, each being a half owner in the lands in controversy. In the present controversy the heirs of South and the complainant have a common interest, as they are alleged to be joint owners with the complainant of the land the title of which is sought to be quieted, and said heirs have the same citizenship as that of Strong, Duff, and the other defendants. But, as complainant could bring an action of ejectment for his undivided interest in the lands in controversy, he can, we think, maintain a bill to quiet the title for his undivided interest in this land, notwithstanding the want of diverse citizenship between South’s heirs and the other defendants.
The bill alleges that complainant and the heirs of J. W. South are tenants in common, and have a fee-simple title in the land in controversy, and the actual possession thereof. Complainant claims, and seeks to sustain by testimony, a derivative title, as follows: (1) A patent issued by the commonwealth of Virginia, January 26, 1787, which granted to Thomas Franklin 116,656 acres of land lying between the Forth and Middle Forks of the Kentucky river, in what *208 was then the county of Fayette. This land is described in said patent as commencing at the junction of said rivers, and running with the meanders thereof many miles, and thence, by a line which is described therein, from one river to the other. (2) That Thomas Franklin’s interest in said patented lands was sold by M. Hardin, as the register of the state of Kentucky, to John Wilson, in the year 1811, for taxes due by said Franklin on said land for the year 1810; that said land thus sold was not redeemed, and was conveyed by John M. Foster, then register of the land office of the state of Kentucky, to said. Wilson, the purchaser thereof, by deed dated December 6, 1815. (3) That the interest of John Wilson in the lands in the Franklin patent which remained unsold in the county of Breathitt was sold for taxes for the years 1836-45, on September 21, 1846, by John Hargis, agent of the then auditor of Kentucky, for taxes due and unpaid by said Wilson, and that at said sale J. W. South and Daniel Breck, Jr., became the purchasers thereof; and subsequently the land thus purchased was conveyed to said South and Breck, by the auditor of the state, in equal shares, and that said deed was recorded in said Breathitt county clerk’s office, and subsequently destroyed by fire. (4) That the interest of Daniel Breck in said land was sold and conveyed to N. C. Morse, Sr., who is the father of the complainant, by deed dated September 13, 1865. (o) That the interest of N. C. Morse, Sr., in said land, was sold in a chancery proceeding brought in the Kenton circuit court, state of Kentucky, and purchased by one Charles Evans, and, the sale being thereafter confirmed, was conveyed to him by a special commissioner of said court; that said Evans subsequently sold his interest in said land, which was five-twelfths, to the complainant, which deed was subsequently lost, and the complainant, not being a party to the proceeding in the Kenton circuit court, inherited one-twelfth part of his father’s (N. C. Morse’s) interest in said land, and thus is a half owner of the interest in said land in controversy. (6) The deed of the auditor to South and Breck having been destroyed by fire, a suit was instituted in the Breathitt circuit court to have a conveyance substituted by the auditor for the one destroyed; and in that proceeding the court ordered a special commissioner (Little) to make the substituted deed of conveyance. This deed is dated 25th October, 1882, and is made to the heirs of J. W. South, he having previously died, and to the complainant and Charles Evans. The bill alleges that the complainant and the defendants, the South heirs, have had possession of the land in controversy, by themselves and those under whom they claim, for a number of years before the filing of the suit, and had, at the time of filing of the suit, the actual possession, and that said defendants Strong, Marcum’s heirs, and Duff claim to be the owners of the land which is described in the bill; that they have been trespassing upon said lands, by cutting logs therefrom; and that they are without any legal or equitable right whatever; and the value of the logs thus taken is alleged.
The defendants William Strong and the Marcum heirs and Duff have answered, and have put in issue all of the material allegations of the bill, except that the commonwealth of Virginia patented to *209 Thomas Franklin the 116,056 acres, as described in the bill. They deny that any title passed either to John Wilson by the conveyance made by J. M. Foster, as register, on December 6, 1815, or that any title passed by the sale of the land for taxes alleged to be due by John Wilson, and the conveyance thereof made by the auditor’s agent in 1846; and they deny that the deed of October 25, 1882, made by Special Commissioner Little, conveyed any title to complainant or to Evans, or to the defendants the South heirs, or that said sale was legally made. They deny that taxes were ever regularly or legally assessed against either Thomas Franklin or John Wilson; and they deny that the complainant has any fee-simple or any title in said lands in controversy or any part thereof; and they deny that said complainant and said South heirs have had actual possession of the land, or any part thereof, at the time of the institution of the suit, or at any other time. Defendants allege that they are the owners of the land in controversy, claiming the same by continuous, notorious, and adverse possession, by well-marked boundaries, for a time more than sufficient to give them title. The defendants William Strong and the heirs of Alfred Marcum claim ownership by adverse possession by a marked boundary, by William Strong, commencing in 1845, and again by William Strong and Alfred Marcum’s heirs, commencing ■ in 1872. They claim adverse and notorious possession, commencing in 1872, with boundaries which are described in two surveys made on the 10th of December, 1872, one for 190 acres, and the other for 250 acres, and for which patents from the commonwealth of Kentucky were immediately applied and issued after a contest with J. W. South by caveat proceedings,—the 190-acre tract by patent dated March 26, 1891, issued to the heirs of Alfred Marcum, and the other dated October 1, 1891, issued to the heirs of Alfred Marcum and William Strong; and it is claimed that the patent for the 190 acres was applied for in the name of William Strong as well as the Marcum heirs, but that Strong’s name was omitted from said patent by oversight. These boundaries are substantially the boundaries which -are set out in the bill of complaint. The defendant Duff sets up a similar claim, and files patents issued from the commonwealth of Kentucky.
It will be seen that the issues thus made go to the title and the possession of the complainant, and also the claim of ownership by the defendants, based upon adverse possession. The complainant cannot maintain his action to remove a cloud upon his title and quiet possession on general principles of equity, without clear proof of both possession and the legal title in himself.
It is said in Frost v. Spitley, 121 U. S. 556, 7 Sup. Ct. 1131:
“Under the jurisdiction and practice in equity, independently of statute, the object of a bill to remove a cloud upon title, and to quiet possession of real estate, is to protect the owner of the legal title from being disturbed in his possession, or harassed by suits in regard to that title; and the bill cannot be maintained without clear proof of both possession and legal title in the plaintiff. Alexander v. Pendleton, 8 Cranch, 462; Peirsoll v. Elliott, 6 Pet. 95; Orton v. Smith, 18 How. 263; Crews v. Burcham, 1 Black, 352; Ward v. Chamberlain, 2 Black, 430. As observed by Justice Grier, in Orton v Smith: ‘Those only *210 who have a clear legal and equitable title to land, connected with possession, have any right to claim the interference of a court of equity to give them peace or dissipate a cloud on title.’ 18 How. 265. A person out of possession cannot maintain such a bill, whether his title is legal or equitable; for, if his title is legal, his remedy at law, by action of ejectment, is plain, adequate, and complete, and, if his title is equitable, he must acquire the legal title, and then bring ejectment. U. S. v. Wilson, 118 U. S. 86, 6 Sup. Ct. 991; Fussell v. Gregg, 113 U. S. 550, 5 Sup. Ct. 631.”
This is also the rule in Kentucky. In Packard v. Valley Co., 28 S. W. 779, the court say:
“The general rule and one well settled in this state is that in order to maintain an action quia timet the plaintiff must have both title and actual possession.”
See Armitage v. Wickliffe, 12 B. Mon. 494; Campbell v. Disney, 93 Ky. 41, 18 S. W. 1027.
It is true this general equity practice will be modified in some respects so as to conform to a state statute when that statute enlarges the equitable rights, and allows the holder of a perfect legal title to be quieted in his title, although he may not have at the time actual possession of the land to which he has a perfect legal title. Thus, in Holland v. Challen, 110 U. S. 16, 3 Sup. Ct. 495, the supreme court sustain á bill quia timet where the complainant had a perfect legal title, but did not have the actual possession. This was a suit in the state of Nebraska, where there was a statute authorizing such a proceeding without actual possession. See, also, Clark v. Smith, 13 Pet. 195.
The state of Kentucky has legislated upon this subject, but has not, we think, changed the equity rule as herein indicated. The Kentucky legislature enacted March 9, 1854, thus:
“That hereafter it shall and may be lawful for any person having hoth the legal title and possession of lands to institute and prosecute by petition in equity in the circuit court of the county where the lands or some part thereof may lie against any other person setting up a claim thereto, and if the plaintiff shall he able to establish and does establish his title to said lands, the defendant shall be by the court ordered and decreed to release his claim thereto, and to pay the plaintiff his costs.”
And on the 10th of March, 1854, the following:
“That the owner of any land in this state may maintain the appropriate action to recover damages for any trespass or injury committed thereon, notwithstanding such owner may not have the actual possession of the land at the time of the commission of the trespass.” Approved March 10, 1854 (Sess. Acts 1853-54, pp. 149, 167).
The first of these acts was not repealed by the General Statutes of Kentucky, and is still, as we understand, the law of the state. Kincaid v. McGowan, 88 Ky. 91, 4 S. W. 802. But the act of March 10, 1854, was repealed by the General Statutes, which covered the same subject-matter. See Hillman v. Hurley, 82 Ky. 629. After the decision of the court of appeals in Hillman y. Hurley, the legislature re-enacted the act of March 10, 1854, in substance as follows:
“The owner of land may maintain the appropriate action to recover damages for any trespass or injury committed thereon, or to prevent or restrain any trespasses or other injuries thereto or thereon, notwithstanding such owner may not have the actual possession of the land at the time of the commission of the trespass.” Act 1888 (Ky. St. § 2361).
*211 The right of action given by the act of 1888 to “prevent or restrain any trespasses or other injuries thereto or thereon” should, we think, be construed to give an equitable remedy by injunction to prevent or restrain such trespasses or injuries, but only in aid of common-law actions, and not as an independent equitable jurisdiction, under which the question of title to real estate or the right of possession should be tried.
The next inquiry, then, is as to complainant’s title. The complainant, to sustain his title under the tax sale to John Wilson, has read an authenticated copy of the certificate signed by Mark Hardin, register of the land office of Kentucky, dated November 5, 1811, and also a certificate of the auditor of the state of Kentucky, George Madison, dated December 5, 1815. These certificates show that Hardin, as register, sold the tract of land described as Thomas Franklin’s 116,656 acres, third rate, lying in the county of Clark, and on the Kentucky river, being entered, surveyed, and patented to Thomas Franklin for taxes due thereon for the year 1810 and costs, and that John Wilson became the purchaser thereof at the sum of |146.07, which was the amount of the taxes for that year and the costs. The certificate of Madison shows that the tract thus sold had not been redeemed. The complainant also read a conveyance from John M. Foster, then register of the land office of the state of Kentucky, dated December 6, 1815, conveying to the said John Wilson the whole of the tract which had been patented by Thomas Franklin. In this deed of conveyance the certificates of Hardin, as register, and Madison, as auditor, are copied, and made a part thereof. He also files as exhibit what purports to be a copy from the -books of the auditor’s office for the assessment of this land for the years 1792 to 1810, both inclusive. This copy is filed in the deposition of L. G. Norman, who was then auditor of the state of Kentucky, and the only evidence in regard to this assessment is the transcript, and what Norman says. He is asked: “If the records of your office show any assessments of the lands, or auy of them covered by it [the patent], please state all you know on that subject.” Answer: “I have a copy of the patent named before me. The records show an assessment to Thomas Franklin from 1792 to 1888, to Thomas Franklin first, and afterwards to others, who held the lands or part of -them. I file attested copy of the record, showing all about it, marked ‘L. C. N.’ I have no personal knowledge of the facts. I speak only of what the records show.” This record, thus filed, purports to be an assessment of this Thomas Franklin patent, or parts thereof, from 1792 to 1888. The assessment is first to Thomas Franklin from 1792 to 1810, both inclusive, and from 1811 to 1838, both inclusive, to John Wilson. These exhibits are all of the evidence offered to sustain the complainant’s title under the sale for taxes for the year 1810.
In the case of Allen v. Robinson, 3 Bibb, 328, the Kentucky court of appeals have said, in regard to such sales and conveyances:
“The sale and conveyance of the register, when legally made, passes to the purchaser the legal title; and, in a contest involving the validity of such a sale, the register’s deed (as he is an officer of the government, presumed by law to *212 do Ms duty) shall be taken as prima facie evidence that the requisitions of the law have been fulfilled; but as the register derives his authority to sell lands for the nonpayment of taxes from the law, to make his deed effectual to pass the title, that authority must be strictly pursued, and, although the deed will prima facie prove the correct exercise of the authority, it can be repelled by ;proof that the law was not regularly pursued in making the sale.”
See, also, Hickman v. Skinner, 3 T. B. Mon. 211.
The defendants deny that this property, thus sold, belonged to Thomas Franklin, or that it was legally assessed in 1810, and insist that the alleged sale is void, and passes no title. To sustain this contention, they have read copies of a deed from Thomas Franklin to Abraham Fowler, dated August 12, 1793, and a deed from said Franklin to Benjamin Walker, dated December 13, 1795, and certain conveyances to the parties to whom the land was subsequently conveyed. The deed from Thomas Franklin to Abraham Fowler conveys all of Franklin’s interest in the tract of land patented to him by the commonwealth of Virginia, on the 26th of January, 1787, and in the same deed another tract of land containing 108,344 acres, but excepting and reserving out of said tracts of land 30,000 acres which is undivided. The deed itself does not indicate what proportion of the 30,000 acres should come out of the 116,656 acres, and what should be taken out of the 108,344 acre tract; but this is not material, as, subsequently, whatever reservations were made were conveyed to another party. Franklin, in the conveyance to Benjamin Walker, conveyed the 30,000 acres, which was reserved in the deed to Abraham Fowler. He describes it in said conveyance as the undivided rights and shares of Samuel Osgood, Maria Osgood, and Daniel Bowen in the lands granted to him, the said Thomas Franklin, by the state of Virginia, in trust for 'them and others. The deed to Abraham Fowler was acknowledged before the mayor of the city of Hew York, August 2, 1794, and again acknowledged before Edward Shipping, a justice of the supreme court of Pennsylvania, March 14, 1796. And the deed to Benjamin Walker was acknowledged by Franklin before Edward Shipping, a justice of the supreme court of Pennsylvania, January 11, 1796. Both of these deeds were put to record in the clerk’s office of the court of appeals of Kentucky on April 11, 1796. The defendants also read authenticated copies of conveyances from Abraham Fowler and wife to Theodosius Fowler, dated February 6, 1795, conveying an undivided 54,150 acres of land in the Thomas Franklin patent of 116,656 acres. This deed was properly acknowledged in the city of Hew York by the grantor, and put to record in the clerk’s office of the Kentucky court of appeals on April 11, 1796. And a conveyance by Benjamin Walker and wife to Bichard Harrison and Joshua Ogden Hoffman, dated March 7, 1796, conveying the 30,000 acres of land conveyed to said Walker by Thomas Franklin. This land thus conveyed is described as being the undivided rights and shares late of Samuel Osgood, Maria Osgood, and Daniel Bowne (Bowen), in the land granted to Thomas Franklin, of Philadelphia, in trust for them and others, and by him conveyed to said Benjamin Walker, by indenture dated 13th of December, 1795. This deed was legally acknowledged in the city of Hew York, March 9, 1796, and recorded *213 in the clerk’s office of the court of appeals April 11, 1796. And also a copy of another conveyance by Benjamin Fowler and wife to Richard Harrison and Joshua Ogden Hoffman, March 1, 1795, conveying an undivided interest in the Franklin patent of 116,656 acres. This deed was acknowledged in the city of New York March 21, 1795, and put to record in the clerk’s office of the court of appeals-of Kentucky, April 11, 1796. And another conveyance by Theodosius Fowler to Richard Harrison and Joshua Ogden Hoffman, dated January 8, 1796, conveying an interest in the said Thomas Franklin patent. This deed was acknowledged in New York City, March 8, 1796, and recorded in the clerk’s office of the court of appeals of Kentucky, April 11, 1796. And another conveyance from Richard Harrison and Joshua Ogden Hoffman to Effenham Embree, dated October 11, 1813, in which they conveyed to said Embree the undivided 30,000 acres conveyed to them by Benjamin Walker on March 7, 1796, in the Franklin patent. This deed was properly acknowledged in the city of New York, October 11, 1813, and recorded in the clerk’s office of the general court of Kentucky, July 8, 1814.
It will be seen from these deeds that all of the right, title, and interest of Thomas Franklin had been conveyed to other parties, and these deeds duly and legally acknowledged,—one on August 2, 1794,, and again the same deed reacknowledged March 14, 1796; and the other deed duly and legally acknowledged January 10, 1796, and' both of them recorded in the clerk’s office of the court of appeals-of Kentucky on the 11th of April, 1796, which recording gave constructive notice of the conveyances. It follows that there was no legal assessment of the land patented to Thomas Franklin as his after the conveyance thereof was made by him to others, and the said conveyances legally recorded in the state of Kentucky. A legal assessment is indispensable to a proper levying of tax. • It is said by Mr. Cooley: “The necessity of an assessment is undoubted; it is the first step, and is the foundation of all that follows.” See Cooley, Tax’n, 259. In Parker v. Overman, 18 How. 142, the supreme court says: “A legal assessment is the foundation of the authority to sell; and, if this objection be sustained, it is fatal to the [tax] deed.” In that case there was a fatal objection to the authority of the officer making the assessment. See, also, Pillow v. Roberts, 13 How. 475.
It is insisted, however, on the part of the complainant, that the assessment once properly made of this patented land against Thomas Franklin continued, notwithstanding he conveyed his entire right, title, and interest therein. This contention necessitates a brief review of the then tax law of Kentucky. Under the first act of the-state of Kentucky, after it became a state, all lands were listed and classified by tax commissioners, who were appointed in each county for that purpose, and the tax itself was collected by the sheriff, and there was no distinction as to assessments between lands owned by residents and nonresidents. Act approved June 26, 1792 (1 Litt. Laws, 63). By an act of Kentucky approved December 19, 1795 (1 Litt. Laws, 321), which became effective March 1, 1796, it is. provided for the first time that all nonresidents shall enter their lands- *214 with the state auditor, under the same rules and regulations as in case of residents. It is also provided that these taxes shall be paid to the treasurer of the state, instead of to the sheriff, and, 'if- the taxes are not paid by the nonresidents, the sheriff of the county where the lands lie shall sell the land in the same manner and under the same regulations as residents’ lands are sold for taxes. It is provided in this law that the auditor shall keep a book for the purpose of receiving and entering the lands of nonresidents for taxation, and that the taxpayers shall enter their lands for taxation therein; but there is no provision made in this law for a book in which transfers are to be noted, nor is there any provision declaring to a nonresident party that the assessment shall be continuous from year to year until changed by him or other parties in interest. By an act approved February 28,1797 (1 Litt. Laws, 653), which is entitled “An act to amend and reduce into one the several acts .establishing the permanent revenue,” the provisions of the acts of December, 1795, as to nonresidents’ lands, are substantially re-enacted, and, in addition, it is provided that the auditor shall keep a book of transfers, and “every nonresident who has entered his lands with the auditor may, on transferring the same to any other person or persons, have the alterations made with the auditor, and charged to the person or persons to whom transferred, and such person shall be chargeable with the tax of such land or lands thereafter.” This law also provided for the sale of the lands by the sheriff for unpaid taxes. This is the first law which provides for a book of transfers in which sales and conveyances are to be entered, so that the property may be taxed as against the successive owners. The next act is an act approved December 21,1799 (2 Litt. Laws, 324). This is an act entitled “An act to amend and reduce into one the several acts establishing the permanent revenue.” It re-enacts the provisions of the previous law as to the entry for taxation of nonresident lands by the auditor, and for a transfer book and the mode of payment, which was to the treasurer; but it changed the officer who was to sell the property for the nonpayment of taxes from the sheriff of the county where the land lies to the register of the state, and provided that the register, when the tax was certified to him as unpaid, should proceed on the third Monday in November in each year, at public auction, at the state house at Frankfort, to sell lands for unpaid taxes, under like regulations as residents’ lands are sold by the sheriff. This act also provides for a transfer book in which nonresidents who had sold their lands or conveyed them could have their transfers entered; but it was not compulsory for them • to do so, nor is there any declaration in the statute that the assessment should continue against the first party assessed, unless such transfer were made in the auditor’s book. This act of 1799 gave the register the same power to execute conveyances for the lands sold by him as the sheriff had who sold the lands of residents' of the state for the nonpayment of taxes.
We think it quite clear that no title passed under the sale of the register in 1811 and the conveyance in 1815, for the taxes due and assessed against Thomas Franklin on these lands, which lands *215 had been conveyed by him many years before, and tbe deeds showing the conveyances recorded as early as April, 1796. The record from the auditor’s book in regard to assessment is very brief indeed, and unsatisfactory; but it is quite evident that part of that record is made up from assessments which were originally made before the tax commissioner, and not before the auditor, and that, if there ever was any return of the lands patented to Thomas Franklin made in the auditor’s office, it was not made by Thomas Franklin, or by any one representing or authorized by him, because there was no provision for a return of nonresidents’ lands to the auditor prior to the act of December 19, 1795, which went into effect March 1, 1796, and at that time, according to the record of transfers filed, Thomas Franklin had ceased to have any interest in the land, although these conveyances were not put to record in the state of Kentucky until April, 1796.
In the case of Bell v. Fry, 5 Dana, 341, the court of appeals had occasion to consider the effect of the register’s deed like the one at bar. The court says:
“The register’s deed purporting to convey the land in question to Achilles Sneed in consequence of a sale of the said lands for taxes charged thereon from 1792 to 1798 was ineffectual to pass the title under Fry’s patent, because the land was sold and conveyed as the land of Joshua Fry, and for taxes charged to him, when he had conveyed it to Vancouver by deed regularly executed, acknowledged, and recorded in 1790, two years before any portion of the taxes for which it was sold were charged or became payable; and it does not appear but that the taxes for the same year were paid by the real owner of the land. The court therefore did not err in refusing to instruct the jury peremptorily that this deed barred the plaintiff’s action.”
By the very terms of tbe register’s deed, it only conveyed the right, title, and interest of Thomas Franklin, and this was in accordance with the law under which the lands were sold for taxes. There is no evidence in the record which proves or tends to prove that John Wilson either took or ever had actual possession of the land which was thus attempted to be conveyed to him by Foster, as register of the state of Kentucky. The only evidence on this subject is that he made quite a number of conveyances, but there is no evidence whatever that he took actual possession of any of the land in the Thomas Franklin patent, claiming the same by well-marked boundaries; so that the complainant’s title must rest, if at all, upon the tax sale of 1846 and adverse possession thereafter.
The sale by John Hargis, as agent of the auditor, made in September, 1846, for taxes alleged to be due from John Wilson could not, of course, pass a title to South and B'reck if John Wilson had no title. We are inclined to think, however, that the attempted sale made in September, 1846, is fatally defective for other reasons. The transcript filed by Norman, auditor, of the assessment of this land, shows that there was no assessment thereon for the years 1839, 1840, 1841,1842, 1843, 1844, and 1845. The copy of the certificate of John Hargis, agent, indicates that the land was sold by him for taxes for the years 1836 to 1845, both inclusive. The record of *216 assessment filed by Norman would indicate that there was no assessment for taxes for the years 1839 to 1816, and the certificate of John Hargis recites that the land had been forfeited for the nonpayment of taxes for the year ■ 1839. The act approved December 7r 1822, provided that it should be the duty of the auditor, when three years’ taxes and interest became due on lands, to advertise the same for three successive months previously to the 1st of November in-the newspapers of the public printer twice each month, stating the amount of taxes, interest, and costs due on each tract; and, if the same be unpaid on any tract or tracts as aforesaid, the same shall be stricken off to the commonwealth, and all the right, title, and interest of such nonresident shall thereby invest in the ■ commonwealth; nevertheless, said land may be redeemed as provided for in the act of December 5, 1820. If this be considered as forfeiting the rights of John Wilson to the state of Kentucky for taxes for the years 1836 to 1838, there is no evidence in the record to show that that which is required by the act of 1822 was ever complied with. Hence there is no evidence to show that the interest of Wilson, if he had any, in the land patented to Thomas Franklin, was assessed for 1839 to 1815, or that it was stricken off to the state under the provisions of the act of 1822, after proper notice. But considering the proceeding by John Hargis, agent, as under the act of 1840, as amended by the act approved March 10, 1843, the record is likewise fatally defective in showing that any title passed by such alleged sale. The act of 1840, as amended by the act of March 10, 1843, authorized the selling of property which had been stricken off to the commonwealth, but provided that the auditor may authorize his agent to sell the same to the former owner, or his heirs or assigns, for the taxes due thereon, with the interest and charges, with 10 per cent, thereon; and further, when no former owner or heirs or assigns could be found to redeem, and there was then any one in possession of such land, or any part thereof, under adverse title, such person in adverse possession shall have the right to quiet his title by paying the amount of the taxes, interest, and charges, with 10 per cent, thereon; and section 3 of the amended act provides "that when there shall be no former owner or his heirs or assigns willing to redeem, and no one in adverse possession willing to purchase, the auditor may direct the agent or attorney to sell the land, in one or more tracts, to suit purchasers for as much as it will bring at public sale, provided it shall not be sold for less money than the amount due the commonwealth, with interest and charges.” Thus, the right of the auditor to direct a sale is dependent on the effort to find the original owner, or the heirs or assigns, and allow bim or them to redeem, or to give the occupant in adverse possession the opportunity to quiet his title, and his refusal to avail himself of it; and then the law provides for the advertising of the sale and the place of sale, which seems to have been done, but there is no evidence here that any effort was made either to find John Wilson or his-heirs, or to inquire whether there was any one in the adverse possession of said land, or any part thereof. This record shows that in *217 this large territory, which was thus sought to be sold, there were a great number of persons who were in the actual possession of part of it, and that they claimed adversely to Wilson’s title.
The court of appeals had occasion to construe the act of 1840 before the amendment of 1843, but when it was as to tax sales substantially as after the amendment, in the case of Bishop v. Lovan, 4 B. Mon. 116. In that decision it declared that it was necessary to be shown that the former owner or heirs were sought to be found before the property could be sold for taxes, and in that case the court say:
“If the agent’s right to sell to a third person is not dependent upon the prior positive refusal of the former owner, his heirs or assigns, and also of the occupant, upon due and proper notice, it was at least certainly the duty of the agent to have made diligent search and inquiry for them, and each of them, before he sold; and upon such diligent search and inquiry had failed to find either-, and only upon such facts being made to appear could his sale be sustained, if ever it could be sustained upon such proof, which we are not now prepared to concede. The agent is a private individual, and is not a public officer. He executes no bond for the faithful discharge of his duties or the indemnifications of those who may be injured by his failure to do his duty, nor is he required to take an oath, nor does he act under the sanction of an official oath. No presumption will be indulged in, therefore, in favor of the regularity of his acts, but the person claiming title under his sale must show that he has done everything which the law requires to be done to authorize the sale; and, as that was not shown in this case, the instruction of the court was proper, and the-judgment is affirmed.” Page 120.
Tbe case at bar is entirely bare of any evidence showing any effort to find Wilson or his heirs, if dead, or to make an offer of redemption to any person who might be in actual and adverse possession of' any part of this land. It is true that the record shows that the-proper public notice was given by publication in the newspaper, and that the sale actually took place, and that William Strong was present at the time of the sale; but there is no evidence at all of any effort to find either John Wilson, or his heirs at law, or to make any offers to the several occupants within this patent of Thomas Franklin. This was an immense body of land, as the record shows, being perhaps one-third of the county of Breathitt, having on it, perhaps, that proportion of the inhabitants of the county. For is there any direct evidence of the appointment of John Hargis as agent of' the auditor previous to the sale in September, 1846. There is no direct or exact evidence as to the contents of the deed which he subsequently executed to J. W. South and Daniel Breck. We therefore do not know what recitals, if any, there were in that deed. The proceeding in the Breathitt circuit court, at the instance of J. W. South’s heirs, to substitute a new deed for the deed which had been executed by John Hargis, does not at all change or strengthen the complainant’s position. The title to -this land was not then in Fayette Hewitt, then the auditor of the state, even assuming that the land had been forfeited. But this land could not have been constitutionally forfeited to Kentucky without office found, under-the act of 1825, as was decided by the court of appeals of Kentucky in Marshall v. McDaniel, 12 Bush, 381.
If I am correct in the conclusion that no title passed by these tax: *218 •sales, either the sale of 1811 or that of *1818, then the only remaining question is whether or not the complainant has acquired title by •adverse possession. The legal effect of the sale by John Hargis in 1816, although it passed no title, may be considered as giving color of title to the entry of J. W. South and Daniel Breck, if they took actual possession of the land in controversy, and held the same continuously, notoriously, and adversely. This record upon the subject of possession both by the complainant and the Souths, and ;also by the defendant, is very voluminous; but, after á careful reading of the testimony, I am perfectly satisfied that neither the complainant, J. W. South, nor his heirs, have ever had actual possession of the land in controversy, which was continuous, notorious, and adverse for 15 years. There is evidence to show a claim of title by J. W. South and Daniel Breck, and by their heirs and assigns, of lands within the Thomas Franklin patent, and that they ■conveyed several tracts of land within said patent. These conveyances, however, were generally to occupants of the land claiming •adversely. There is also evidence that shows that J. W. South individually in his lifetime, and his heirs since his death, held the actual possession of two tracts of land with marked boundaries, that are near, if they are not adjoining, the land in controversy. But these tracts were not entered by South under his alleged purchase at tas sales in 1816, nor were they held under said sale by South for himself and Breck or Breck’s vendees. There is no evidence of an .actual possession of the land in controversy by South and Breck and those claiming under them for any continuous time, although there is evidence showing an occasional mining of coal; said mining not continuing from season to season, but once or twice in a series of years, and also of an occasional cutting of timber on the land in 'Controversy. But there is certainly not sufficient evidence to prove •an actual, continuous, notorious, and adverse possession for 15 years, or, indeed, for any number of years; and, as the complainant has not the legal title, it must follow that his bill cannot be sustained.
This view makes it unnecessary to consider either the title of the defendants or their claim to title arising from adverse possession, as the relief, if granted at all, must be upon the strength of complainant’s own title. It follows from this view that the complainant’s bill should be dismissed, with costs; and it is so ordered.