**BARNES v. BOYD et al.**

District Court, S. D. West Virginia, at Charleston.

Feb. 15, 1934.

Fairleigh & Fairleigh, of Louisville, Ky., for plaintiff.

Price, Smith & Spilman, Conley & Klostermeyer, Brown, Jackson & Knight, MacCorkle, Clark & MacCorkle, Koontz, Hurlbutt & Revercomb, and Herbert L. Carney, all of Charleston, W. Va., for various defendants.

PAUL, District Judge.

This is a suit in equity brought by the plaintiff, Rose Hudson Barnes, against numerous defendants having estates of varying nature in certain tracts of lands in Kanawha county, W. Va.

Briefly stated, and omitting the detailed allegations, the substance of the original bill is as follows:

That in 1794 the commonwealth of Virginia granted a large tract, described as containing 40,000 acres of land, in what is now Kanawha county, W. Va., to one Jacob Skiles. That some years thereafter, in 1841, the land purporting to be the Skiles survey was sold by the commissioners of delinquent and forfeited lands for nonpayment of taxes; that one John D. Lewis purchased three tracts of what purported or was claimed to be the Skiles land; these three tracts are described as containing in the aggregate about 45,000 acres.

It is alleged that the commissioners of delinquent lands, being unable to identify the Skiles survey, made up an imaginary or fictitious plat from which they made the sale to Lewis and that the lands shown on this plat and purported to be acquired by Lewis were not the lands of the Skiles survey, but included waste and unappropriated land belonging to the commonwealth, which there was no right to sell.

That, beginning in 1858 and within four or five years thereafter, William A. McMullin and John P. Hale acquired various tracts of land by grant from the commonwealth, aggregating 30,475 acres. That these various tracts were definitely located on the ground by well known and ascertainable boundary marks. The bill does not so explicitly allege, but it is plainly inferable and was no doubt meant to be alleged, that in the sale made in 1841 by the commissioners of delinquent lands these commissioners undertook to sell and convey to Lewis lands which were not included in the so-called Skiles survey, but which were in fact unappropriated lands belonging to the commonwealth and were in large part the same lands which were later granted by the commonwealth to McMullin and Hale.

It is further alleged that Wm. A. McMullin and John P. Hale brought several ejectment suits against John D. Lewis and others to determine title to portions of these lands, and that these suits resulted favorably to the plaintiffs. (The date of these suits is not given, but they were apparently tried between 1865 and 1872).

William A. McMullin died intestate in October, 1872, leaving four children. Apparently at this time there were pending a number of other ejectment suits involving portions of the lands in question, for it is alleged that upon the death of Wm. A. McMullin, his surviving coparcener, Hale, assumed full and exclusive control of all matters pertaining to the lands in question, "including the management of the suits in ejectment against said John D. Lewis."

These pending ejectment suits appear to have been fourteen in number, involving in the aggregate eighteen or twenty thousand acres of land.

The bill then alleges—and this is the gravamen of this suit—that shortly after the death of McMullin, his coparcener, Hale, fraudulently agreed and conspired with Lewis to surrender and forfeit to Lewis all right, title, and interest of the McMullin heirs and of Hale in and to the lands which were the subject-matter of the pending ejectment suits and which were claimed by Lewis as comprised within the Skiles survey. That in pursuance of this fraudulent scheme, Hale and Lewis agreed to submit all of the ejectment suits to three arbitrators, whose award in each case should be entered as the judgment of the court. That Hale procured as counsel ostensibly representing him and the McMullin interests an incompetent attorney who was in fact friendly to Lewis, and that the maps and other data presented before the arbitrators were false and submitted with the purpose on the part of Hale of obtaining awards favorable to Lewis. That the plats filed by the arbitrators as explanatory of their awards were false and contained fictitious metes and bounds. That the awards, except as to a very small portion

of the lands, were in favor of Lewis, and that this result was one which the parties had fraudulently conspired to bring about. That judgments were entered on the awards on December 20, 1877. Other details as to the manner in which this arbitration was handled are set forth as evidence of the fraudulent scheme entered into by the parties, and it is alleged that Hale profited by his dishonest agreement to surrender the lands to Lewis. And it is expressly charged that the arbitrators colluded and connived with the conspirators (Hale and Lewis), and that the arbitrators were guilty of fraud and of aiding and abetting in the perpetration of the fraudulent scheme to deprive the McMullin heirs of their rightful interest in this land.

The bill states the object and purpose of the suit to be "to have declared void and set aside the judgments entered on the 20th day of December 1877, in the Kanawha Circuit Court of Kanawha County, West Virginia, which judgments were based upon and followed a false and fraudulent award of arbitrators in certain suits in said Court entitled McMullin and Hale et al. against Lewis and Dickinson et al. ⸫ * * *"

And the prayer of the bill is: "That the several awards of the said arbitrators under date of August 24, 1876, as herein set out, and the several judgments of December 20, 1877, entered in the Circuit Court of Kanawha, West Virginia, rendered in pursuance to said awards be each and all declared null and void and held for naught."

It is also prayed that certain deeds, leases, etc., made by Lewis or his successors in title to portions of the lands be declared null and void.

There has also been filed an amended bill, the contents and purpose of which will be herein later discussed.

In the natural course of the development of a growing and industrially active community, the lands have been subdivided and have passed into the hands of various persons, with the result that the defendants here are in large number.

On his death in 1872, William A. McMullin left four children: John L. McMullin, Rhoda S. McMullin Cooke, Jas. H. McMullin, and Mary McMullin Hudson (the mother of the plaintiff). The plaintiff, who is a resident of Kentucky, is a granddaughter of William A. McMullin, being the sole surviving child of Mary McMullin Hudson.

This is the third suit which has been brought in this court by grandchildren of William A. McMullin, affecting the same lands and based upon the same alleged happenings as are set out here. The first of these was brought by Nelson V. McMullen, as plaintiff; he being a son of J. L. McMullen. The plaintiff in the second of these suits was Rose Cooke Morse, a daughter of Rhoda McMullen Cooke. (Note: In the previous cases the name McMullen is spelled with the letter "e" in the last syllable; in the present case the plaintiff uses the letter "i" in the spelling. This is noted merely to prevent confusion.) In each of these previous cases a motion to dismiss the bill was granted by the District Court and on appeal was affirmed by the Circuit Court of Appeals. See McMullen v. Lewis (C. C. A.) 32 F.(2d) 481, and Morse v. Lewis (C. C. A.) 54 F.(2d) 1027.

In both of the previous cases, the prayer of the bill was the same in effect as it is here, as shown by the following excerpts:

In McMullen v. Lewis, the bill prays "that the award of said arbitrators under date of August 24, 1876, made by David Lamb, H. J. Samuels and Jas. Morrow, Jr., as herein set out and the judgment of the Circuit Court of Kanawha County, West Virginia, rendered in pursuance to said award of December 20, 1877, be declared to be null and void. * * * *"

In Morse v. Lewis, the prayer is "that the awards of said arbitrators, as herein set out, and the judgments of the Circuit Court of Kanawha County, West Virginia, rendered in pursuance to said awards, be declared to be null and void as to complainant. * * * *"

It will thus be seen that in each of these successive suits the attack is centered upon the alleged fraudulent awards made by the arbitrators in the ejectment suits and the judgments based thereon. I have gone over the records in both of the previous cases. The record in McMullen v. Lewis is quite lengthy and shows that the plaintiff filed several amended bills in an effort to strengthen his position and to meet objections to the original bill. In the case of Morse v. Lewis, it is apparent that the plaintiff, in drafting her bill, had it in mind to negative the objections which led to the dismissal of the bill and amended bills in McMullen v. Lewis. And it is also apparent that in the instant case the bill and amended bill are drawn with a view to surmounting the objections which led the court to dismiss the two previous suits, at the same time preserving and repeating the allegations made in the previous suits. The result is that the bill in

the instant case is voluminous and detailed, consisting of a consolidation of the allegations made in the two previous cases, together with additions thereto.

As in the two previous cases, the defendants have moved to dismiss the bill and amended bill, and it is this motion that is now under consideration by the court.

In determining this motion to dismiss, the court is not at liberty to look only at the contents of the bill itself and to ignore the decisions of this court and of the appellate court in the previous suits. Certain allegations were there considered and passed upon; and so far as they reappear in this case in the same or substantially the same form, and so far as they are pertinent to the maintenance of this suit, I must consider and recognize what was determined regarding them in the previous cases.

It is the right of the court also, and I think its duty, to take notice of the records in the cases of McMullen v. Lewis and Morse v. Lewis so far as any facts disclosed therein are pertinent to this case. In his consideration of the case of Morse v. Lewis, Judge Northcott felt bound to take notice of facts disclosed by the record in McMullen v. Lewis and this action was approved by the Circuit Court of Appeals, citing among other cases De Bearn v. Safe Deposit Co., 233 U. S. 24, 34 S. Ct. 584, 58 L. Ed. 833, and Bienville Water Supply Co. v. City of Mobile, 186 U. S. 212, 22 S. Ct. 820, 46 L. Ed. 1132.

I am not free, therefore, to consider the allegations of the bill here as setting forth an entirely new and independent proposition not related in any respect to what has appeared in the other cases. My task is rather to determine whether the bill in the instant case, considered in relation to those in the previous cases, sets forth such additional facts or such a different state of facts as to enable this particular plaintiff to maintain this suit.

It is impossible in any limited space to set forth in detail the allegations of the bills in these successive suits. Only their substance can be or need be referred to. In the first case, McMullen v. Lewis, the substance of the original bill was that Hale and Lewis fraudulently concealed and withheld from the arbitrators vital and pertinent evidence; that the awards were based upon a mistake, in that the arbitrators misconstrued the effect of certain surveys and other instruments before them; that the arbitrators acted upon the assumed effect of certain facts which was con-

trary to the effect given thereto by the Supreme Court of West Virginia. By a succession of amended bills, the above allegations were stated in somewhat different language and enlarged to include the charge that Hale and Lewis together with the attorney, Hogeman, conspired to defraud the McMullin heirs and to deceive and defraud the arbitrators by concealing from the latter pertinent evidence and by presenting other fraudulent and incompetent evidence; that certain records and decisions of cases decided by the Supreme Court of West Virginia, involving title of the same land, were fraudulently concealed from the arbitrators; that the award of the arbitrators was based on a mistake, in that they accepted as true certain lines and water courses as shown on plats submitted to them which were in fact untrue. The plaintiff alleged that he had never lived in West Virginia and that not until very recent years had he had any knowledge of his rights in the land in question. With the bill the plaintiff filed voluminous exhibits, including a copy of the record in the ejectment suits in which the alleged fraudulent award was made, together with various maps, plats, etc. With his third amended bill the plaintiff filed still other exhibits, consisting of the record in the case of Clarke et al. v. Lewis.

Motions to dismiss the bill and amended bills were made. Omitting the formal and general grounds set forth in these motions, the pertinent grounds advanced, briefly stated, were: That the plaintiff was barred from maintaining the suit by the laches, delay, and neglect of himself and of his father under whom he claimed. That no fraud was alleged on the part of the defendants or of anyone under whom they claimed. That it appeared from the exhibits filed that, following the awards in the ejectment cases and the judgments thereon, the Supreme Court of West Virginia had refused a writ of error to review said judgments and that thereby the validity of said award and the correctness of said judgment became res adjudicata. That the validity of said award and said judgment have been recognized and declared in a number of cases in both state and federal courts. That the allegations of fraudulent conspiracy were insufficient because it did not appear what material or pertinent evidence was concealed from the arbitrators or in what way they were improperly influenced or that their award would have been different had they had before them certain matter alleged to have been concealed from them. That it appeared from the bill that all

parties to the ejectment suits were long since dead, as were other persons familiar with the facts, and that it would be inequitable to permit the suit to be maintained against the defendants, after the lapse of fifty years.

The motion to dismiss was sustained, and this action was affirmed by the Circuit Court of Appeals. McMullen v. Lewis, 32 F.(2d) 481. The court was of opinion that the bill failed to allege facts justifying the conclusion that the ejectment cases were fraudulently handled and that the exhibits filed with the bill tended to show the contrary, that the averments of a conspiracy among Hale, Lewis, and Hogeman were not supported by such specific allegations of fact as to justify a charge of fraudulent conspiracy, and that the laches both of the plaintiff and of his father, J. Lewis McMullen, was such as to deny the right to maintain the suit.

Following dismissal of the suit of McMullen v. Lewis, and in October, 1930, Rose Cooke Morse, another grandchild of William A. McMullin and a first cousin of the plaintiff in the first suit, instituted a suit in this court which, as previously stated, had the same object as the suit of McMullen v. Lewis. The bill in this case contained substantially the same charges as to conspiracy among Hale, Lewis, and Hogeman, the perpetration of fraud upon the commissioners, etc., as was set out in the first suit. It further states that the fraud perpetrated by said conspirators and the action of the arbitrators pursuant thereto was so skillfully concealed that the same could not be detected without the aid of an actual survey on the ground or the United States topographical and geological maps "made only a few years ago." In an effort to meet the defense of laches raised in the first case, the plaintiff alleged that, at the time of the awards in the ejectment suits, she was an infant six years old and living with her parents in Kentucky; that thereafter, in 1885, she together with her parents removed to Texas and that she had resided in Texas ever since; that she had never lived in West Virginia; and that her mother had not lived in that state since leaving there in 1870, which was previous to the time the matters complained of arose. Plaintiff further averred that she knew nothing of or concerning any land in West Virginia or that her grandfather owned any land there until the year 1930; that her mother, Rhoda McMullen Cooke, knew nothing about the location of lands involved in the arbitration nor anything about the controversy concerning them; and that neither the plaintiff nor her mother were made parties in the ejectment proceedings or appeared therein.

It may be noted that the bill in this case (Morse v. Lewis) does not tender or refer to the exhibits, namely, the maps, plats, and court records, which accompanied the bill in the first case. In the previous case, the court had commented that the exhibits themselves tended to contradict the charge of fraud; and this may have been the reason why they were omitted. However, as shown by its opinion, the court took notice of the purport and effect of the exhibits previously filed.

There was a motion to dismiss the bill in this second suit, setting forth substantially the same grounds as the corresponding motion in the first case with the additional grounds that this was an attempt to litigate again the same questions decided in McMullen v. Lewis; that the opinion in that case had held that the award of the arbitrators in the ejectment cases, even if mistakenly arrived at, was, in the absence of fraud, now res adjudicata; that the bill showed that the supposed cause of action was barred by limitation; that, although the suit sought to annul certain court proceedings and records alleged to have been carried on and accomplished through fraud, no copy of the record of such proceedings was exhibited. The motion also avers the laches of plaintiff and of her mother, through whom she claimed.

Here also the motion to dismiss the bill was sustained, the trial court holding that it was unable to reach a different conclusion from that held by it in the McMullen Case, that the same objections to maintenance of the suit appears as in the previous case. The court, noting the fact that there had not been filed the exhibits from which certain inferences had been drawn in the McMullen Case, held it to be its duty to take notice of and give effect to the record in the previous case. The court also held that the plaintiff was chargeable with laches.

This case was also taken to the Circuit Court of Appeals, and the opinion of that court, by Judge Soper, affirming the dismissal of the bill, appears in 54 F.(2d) 1027, 1029.

The court there approved the action of the trial judge of taking into consideration facts disclosed in the previous case and on this subject says: "There is no substantial difference between the bill in the suit of Nelson v. McMullen and that in the pending suit in respect to the allegations wherein the fraudulent conspiracy is described. It was pointed

out, in the opinion of this court in the prior case, that the exhibits filed with the bill did not support the grave charges therein made, but tended directly to the contrary both in respect to the conspiracy charged and the deception of the arbitrators alleged to have been accomplished. The complainant in the pending case endeavored to avoid the effect of this decision by the simple device of withholding the exhibits from the present record. This palpable omission, however, availed the complainant nothing, for the District Court took judicial notice of the proceedings in the earlier case, and considered the exhibits as if filed with the present bill. That document indeed referred expressly to the suit of Nelson V. McMullen and the decision of this court. We think that the action of the District Court in this respect was eminently proper, for the award of the arbitrators, alleged to have been fraudulently obtained, formed the identical and essential basis of both suits; and it would have been a futile and senseless proceeding, under the circumstances, for the court to have closed its eyes to an undisputed fact shown by its own records."

The appellate court likewise held the view that maintenance of the suit was barred by laches of the plaintiff and of her mother. Reciting that the plaintiff's mother, Rhoda McMullen Cooke, had lived for thirty-one years after the entry of the judgments in the ejectment cases and took no steps whatever to investigate the matter, the court says that no satisfactory explanation of her inaction is offered; it not being claimed that she had no knowledge of her father's interest in the lands during his lifetime or that she had no means of acquiring knowledge thereof after his death. The court then says that the plaintiff, although an infant at the time of the ejectment awards, is chargeable with her mother's delay and neglect in the assertion of rights in this land. The court further states that the allegation in the bill that plaintiff's mother was not a party to the arbitration suits and was not served with process therein "is contradicted by the exhibits filed in the earlier case." McMullen v. Lewis. This statement is, I think, to be particularly noted as fixing the duty of this court to take notice in the instant case of pertinent facts disclosed by the records in the previous cases.

I have chosen to set forth at some length the nature of the bills, the proceedings and results in the two previous cases, for the reason that, so far as pertinent, these must be taken into consideration in determining the questions now before me. That they may be, and in some respects are undoubtedly, pertinent, has already been decided.

In the instant case, the plaintiff is Rose Hudson Barnes, the daughter of Mary J. McMullin Hudson, who in turn was one of the two daughters of Wm. A. McMullin. The plaintiff is, therefore, a grandchild of William A. McMullin and a first cousin to the respective plaintiffs in the two previous suits affecting this land.

The bill in this case is voluminous, consisting of between fifty and sixty typewritten pages. It contains the allegations made in the two previous cases, with amplifications thereof, and contains also much additional matter by which it is sought to show the nature and extent of the alleged fraud perpetrated in the ejectment proceedings. Many maps or plats are exhibited with the bill, for the purpose of showing the allegedly true lines of certain tracts of lands and the alleged fictitious or erroneous lines upon which the arbitrators acted, and considerable part of the bill is taken up with pointing out the respects in which the maps and plats relied upon by the arbitrators and upon which the awards and judgments were based were false and fictitious. There is set out in the bill abstracts of the judgments entered upon the awards in the several ejectment suits, but no other records relating to these suits are set out or exhibited. While the bill here recites more extensively and in greater detail than was done in the previous cases the facts and circumstances relied on as supporting the charge of fraud and conspiracy, a careful reading of the bill discloses that the ground upon which the suit is based and the allegations in support of it are essentially the same. While the charge was made in the former suits that the awards of the arbitrators were false and fraudulent, this has in the present case been made somewhat more specific by charging that the arbitrators were parties to and participated in the perpetration of the fraud. To quote from the bill: "Complainant charges said arbitrators with covin and fraud and with aiding and abetting said conspirators," etc. And again: "Complainant * * * charges collusion and connivance of said arbitrators with said conspirators." This last is obviously an attempt to surmount the statement made in Judge Northcott's opinion in McMullen v. Lewis to the effect that even if the arbitrators were mistaken in the conclusion reached by them, *in the absence of fraud,* their findings as approved by the courts are now res adjudicata. And so the lengthy and detailed recital of cir-

cumstances supporting the allegations of fraud are made to meet the views of the courts in the two previous cases, that there was an insufficient allegation of facts upon which to base the charge of fraud.

However, there is nothing objectionable in the effort of the plaintiff here to place herself upon firm ground as to the matters which in part led to the dismissal of the previous suits, provided her allegations here are made in good faith and with the expectation of being able to prove them, as I assume they were. I comment on these averments of the bill in order to point out that, except for them, the bill here is substantially as in the previous cases.

Motions to dismiss the bill here have been separately filed by various defendants, but they are all practically the same and, in condensed form, the grounds thereof are substantially as follows:

1. That this is a third attempt to litigate questions already decided by this court and the Circuit Court of Appeals in the previous suits involving the same lands.

2. That the plaintiff is barred by her laches, delay, and neglect in attempting to review and annul the judgments in the ejectment cases after the lapse of more than fifty years.

3. That because of the lapse of time, with the consequent loss of evidence through the death of witnesses and otherwise, the intervention of other equitable rights, etc., it would be inequitable that the plaintiff now be allowed to maintain this suit.

4. That the charges of fraud against the arbitrators and against Lewis, Hale, and Hogeman are mere unfounded conclusions, not supported by any facts sufficiently alleged.

5. That, even if the arbitrators were mistaken in the conclusion reached by them, in the absence of fraud the finding as approved by the court is now res adjudicata.

6. That neither plaintiff, nor any one under whom she claims, has, at any time since the entry of the awards or judgments, paid any taxes on any part of the land or had possession thereof or asserted claim thereto.

7. That the defendants, those under whom they claim, their lessees, etc., have had actual, continuous, and exclusive possession of the lands since 1877, and that therefore plaintiff's cause of action is barred by the statute governing the limitation of actions for the recovery of land.

8. That the bill does not sufficiently show the interest, if any, which plaintiff has in the lands.

9. That the bill does not make parties to the suit, either as plaintiffs or defendants, the other heirs of William A. McMullin, and that they are necessary parties to any complete and final adjudication of the title to the land involved.

10. That the bill is evasive and indefinite in its averments as to which of the lands are claimed by defendants or any of them, and the bill is in this respect unintelligible and insufficient.

11. That the bill, by reason of its uncertainty and evasion and its suppression of the record of proceeding in the ejectment cases, is an abuse of judicial process and an attempted fraud on the jurisdiction of the court.

12. That in this suit the court will take notice of the exhibits filed in the previous suit of McMullen v. Lewis, which exhibits tend to deny and contradict the charges of fraud and deception.

The plaintiff in turn has filed a motion to strike out the motion to dismiss the bill, in which she attacks the various grounds set forth in the motion to dismiss, asserting the inapplicability of some of them to the present case and that others are of such nature as can be asserted only by answer. There is no need to become involved in a maze of technical pleading. The matter set out in the motion to strike the motion to dismiss is the same that would be and has been advanced in the argument supporting the sufficiency of the bill and in opposition to dismissing it. There was no need of a formal motion to strike.

As set forth in the original bill, the object of this suit and the grounds upon which it is sought to attain this object may, after all, be stated very briefly:

This court is asked to declare as null and void judgments regularly entered, after hearing, by a court of record of the state of West Virginia fifty-five years ago. To support the prayer for this unusual step, it is alleged that the judgments were based on awards made by arbitrators and that these awards were not in accordance with the merits of the matter in dispute before the arbitrators. That the arbitrators had been induced to arrive at their awards by false and fraudulent evidence presented before them through the fraudulent conspiracy of counsel and litigants, and that the arbitrators were parties

592

to this conspiracy and knowingly and fraudulently made awards contrary to the merits of the matters before them.

█ It is needless to say that a suit having the object here sought should not be maintained unless the bill sets forth a state of facts clearly justifying the charges of fraud which form the basis of the suit.

The allegations of fraud in this bill might be conveniently classified as: First, such averments as that litigants, counsel, and arbitrators "fraudulently conspired" or "were guilty of fraud," etc.; and, second, the averments of the facts which constituted the alleged fraud or were the evidence of it.

█ It is well settled that averments of the sort first mentioned are not in themselves sufficient. "Fraud" in its literal sense is a matter of intent or design—a state of mind. In a legal sense fraud is an inference or conclusion of law to be reached only upon the existence of facts which lead clearly to that conclusion. The mere averment that something is "fraudulent" is not sufficient. In order to justify the maintenance of a suit to correct a fraud, the bill must set forth such acts done or omitted as that the court may see that, if proven, they do constitute and prove fraud.

Therefore, the sufficiency of plaintiff's bill is not determined by her use of the word "fraud" no matter how frequently reiterated. It depends upon whether the facts alleged constitute fraud, or, to put it otherwise, lead clearly to the conclusion of fraud.

█ In the previous suits involving this same land, both the district and appellate courts were of opinion that the bills in those cases did not set forth facts sufficiently establishing charges of fraud or fraudulent conspiracy. In arriving at this view they were apparently influenced largely by the facts disclosed by the record of the proceedings in the ejectment cases which was exhibited as part of the bill in the first case (McMullen v. Lewis) and which, in the opinion of the court there, not only failed to support the charges of fraud, but tended to show the contrary. The court said, in effect, that allegations of "fraud" were not sufficient, if the facts set forth in support of the charge failed to support it or if they tended to negative it.

The same situation exists in the instant case, and the same principles are applicable. The record in the ejectment proceedings is before this court through its exhibition as part of the bill in the previous case involving the same land and the same cause of action. The contents of that record and the facts disclosed by it must be considered here.

In considering the proceedings in the ejectment suits, which I have read at length, I agree with the views of the court in the previous cases, that this record not only fails to support the charges of fraud, but tends to the contrary. It seems to me further, if I read correctly the proceedings in the ejectment cases, that most of the same facts upon which it is now sought to base the charge of fraud upon the part of the arbitrators were raised and argued before the circuit court of Kanawha county in its hearing upon the exceptions taken to the award of the arbitrators.

The alleged inaccuracy and falsity of maps and plats put in evidence before the arbitrators; the similar inaccuracy of the maps returned by the arbitrators in explanation of their awards; the alleged action of the arbitrators in ignoring principles of law laid down in previously decided cases—all of these, which are now alleged as acts of fraud, were, I find, advanced and argued before the arbitrators and before the circuit court on the exceptions taken to the awards. Likewise, as to the assertion in the instant case that, in the purported sale of the Skiles land by the commissioners of forfeited and delinquent lands in 1841, these commissioners in fact sold and attempted to convey waste and unappropriated lands belonging to the commonwealth. I find that this question was raised and argued in the ejectment cases.

In the main and in each important particular, the same matters of fact and of law which are here alleged to support the charge of fraud are the same which were considered and adjudicated in the rendition of the judgments by the circuit court of Kanawha county in 1877. This court is now asked, in effect, to review the action of the West Virginia court on the questions of fact and law raised in the ejectment cases. And the method by which this is sought is to renew the contentions made before the arbitrators and the circuit court and add thereto the allegation that in failing to agree with these contentions and in arriving at conclusions opposed to them, the arbitrators acted fraudulently. But this allegation of fraud is supported by nothing more than the allegations of error in the proceedings and in the conclusions of the arbitrators—the same alleged errors insisted on at the time.

Or, in other words, the plaintiff renews here the contentions as to error in the ar-

bitration awards, already passed on by the West Virginia court, and merely by attaching to them the label "fraudulent" invokes the jurisdiction of this court in a new and original suit to have them passed on again. This cannot be done. Errors in the proceedings or conclusions of the arbitrators even if committed are not in themselves sufficient evidence of fraud. Facts must be alleged indicating that in reaching their conclusions the arbitrators were actuated by fraud. This cannot be done merely by repeating the contention of error and designating it as fraudulent; neither is it supplied by the mere fact that the awards were erroneous, if they were in fact so. There must be something independent and outside of the error in the awards to indicate that they were fraudulently arrived at.

It is true that there are certain other allegations claimed as showing fraud, such as that the attorney Hogeman had been a business associate of some member of the Lewis family, that Hogeman had previously represented the sons-in-law of Lewis in some other legal proceedings, etc. But these statements, made with a purpose of showing a friendliness between Hogeman and Lewis and thereby suggesting fraudulent collusion between them, are, in my opinion, trivial. There is nothing of any substance alleged as supporting a charge of fraud outside of and independent of the alleged errors in the proceedings and conclusions of the arbitrators.

As to this phase of the case, I am of opinion that there is no such showing of fraud made by the allegations of the bill as entitle the plaintiff to maintain the suit on that ground. Despite the fact that the bill here is more voluminous and detailed than in the previous cases, its allegations are essentially the same as in McMullen v. Lewis and Morse v. Lewis.

It is to be noted that the plaintiff has throughout objected to the consideration by the court of the matter shown by the records of the circuit court of Kanawha county, W. Va., as contained in the record of the case of McMullen v. Lewis and to the consideration by the court of any parts of the record in that case or in the case of Morse v. Lewis. The plaintiff contends that the records in neither of these cases are before the court; that she was not a party to either one of these suits; and that any consideration and adjudication of her rights upon the matter contained in said records denies her the equal protection of the law and due process of law as guaranteed her in the Fifth and Fourteenth Amendments to the Constitution of the United States. The court has overruled said objections and for the reasons previously stated herein is of the opinion that the facts disclosed by those records are necessarily and properly to be considered in determining the question before it.

## Laches.

The defendants, among other grounds in their motion to dismiss, assert that the plaintiff is shown to be guilty of laches in the failure to complain until now of happenings occurring more than a half century ago.

The length of time which has elapsed would, without some explanation or justification of the delay, indicate laches beyond doubt. The facts as to plaintiff's residence, knowledge of her rights, etc., as alleged in the bill, are substantially as follows:

The complainant's mother, Mary McMullin Hudson (daughter of William A. McMullin), after her marriage in 1855, removed from West Virginia to Kentucky and in 1875 returned to live at St. Albans, W. Va. The complainant was born at this latter place in 1875, and with her mother and father continued to live there until 1890, when they removed to Mt. Sterling, Ky. Mary McMullin Hudson (complainant's mother) apparently returned to West Virginia at some time thereafter, for it is alleged that she died at Bluefield in that state in the year 1914. The plaintiff is a resident of Kentucky and, while the record does not disclose whether she has lived there continuously since going to Kentucky with her parents in 1890, I will presume that she has.

It therefore appears that from 1875 until 1890, a period of 15 years, plaintiff's mother was living at St. Albans, W. Va., as was also the plaintiff. St. Albans is in Kanawha county in the circuit court of which the proceedings attacked in this suit took place; and the plaintiff and her mother were living at St. Albans at the time when the arbitration agreement was entered into, and continued to live there until some 12 or 13 years after the entry of the judgments by the circuit court of Kanawha county. The plaintiff was a mere child throughout this period, but her mother was a woman of middle age.

Mary McMullin Hudson was in fact a party in the ejectment proceedings, the record showing that the cases in which her father, Wm. A. McMullin, had been plaintiff were, after his death, revived in the name of his heirs, including Mary McMullin Hudson.

594

Following the awards, rules to show cause against the awards—or "summons," as they are designated in the orders—were issued and served upon, among others, Mary McMullin Hudson. It is difficult to see how she could have lacked knowledge of the various steps in the proceedings. The record shows her to have been a party plaintiff in those cases where she was a necessary party; she was represented by counsel, and she was informed of and invited to show cause against the adverse awards. Conceding that as an actual fact counsel usually direct the course of litigation and that there may be occasions when not all parties to suits are familiar with their progress or the manner of their conduct, or even of their exact nature, the fact remains that Mary McMullin Hudson was living in Kanawha county where these lands were located and not far from the county seat where the proceedings were taking place. It would be unreasonable to assume anything other than that she was familiar with the proceedings and of their nature and purpose. There is no basis for a contention that she or her descendants were divested of their rights in proceedings to which they were not parties and of which they had no knowledge.

■■ During the lifetime of Mary McMullin Hudson no steps were taken by her impugning the validity of the judgments now attacked.

The plaintiff alleges that her mother never suspected, or had reason to suspect, that any fraud had been perpetrated in the ejectment proceedings, and alleges that the fraud was so skillfully and astutely concealed that it would not be detected by any one other than the conspirators, without an accurate knowledge of surveying or "by and with an accurate knowledge of the United States Topographical and Geological Maps of Kanawha County, West Virginia, made in said state in recent years."

Plaintiff does not allege when the topographical maps referred to were made and does not allege that these maps in any way contributed to her belated knowledge of the conditions which she now alleges to have been fraudulent. On the contrary, the plaintiff alleges that she had no knowledge of the fraudulent awards and illegal judgments until the last few years, and then ascertained it by hearing of the suits of McMullen v. Lewis and Morse v. Lewis; these being the two suits affecting this land brought in recent years by the cousins of the plaintiff and to which I have made frequent reference. Upon hearing of these previous suits, plain-

tiff alleges, she proceeded with due diligence and discretion to employ counsel, and after their investigations and as a result thereof this suit was brought.

The reasons assigned by the plaintiff why no suit was brought for more than fifty years do not stand up well when compared with other allegations of her bill. She asserts that the fraud was so well concealed as that it was not suspected and could not be discovered until recent years and after her mother's death. But elsewhere she alleges, as among the acts evidencing or constituting the fraud, the following: That Hogeman, an incompetent and hostile attorney, a friend and associate of the opposing litigant, was substituted as counsel in the ejectment cases; that certain maps then in existence were withheld from the arbitrators; that then recent court decisions were concealed from the arbitrators; that the arbitrators ignored settled principles of law; that the arbitrators ignored the effect of the sale by the commissioners of forfeited and delinquent land.

All of the foregoing are alleged to have been done fraudulently and are relied on as constituting the fraud upon which this suit is based. There is obviously no justification for saying that it was impossible to discover these things until within the last few years. Any or all of them, if true, should have been apparent at the time or have been discovered at any time upon the slightest investigation or even by attention to the proceedings of the arbitrators at the time. The plaintiff's mother, who was a party to the ejectment proceedings and who lived in Kanawha county for 12 or 13 years afterward, never, so far as shown, questioned the validity of these judgments. Because of her place of residence, as well as her connection with the cases and knowledge of them, she had full and easy opportunity to inform herself of her rights.

The allegation that Mary McMullin Hudson during her lifetime was in ignorance of the fraud allegedly perpetrated is not sufficient. It must appear that she was not negligent or at fault in remaining ignorant. She must have used due diligence to inform herself of all the facts, and is chargeable with such knowledge as the exercise of due diligence would have disclosed. Foster v. Mansfield, etc., Co., 146 U. S. 88, 13 S. Ct. 28, 36 L. Ed. 899; and see McMullen v. Lewis (C. C. A.) 32 F.(2d) 481, at page 485, and cases there cited. If Mary McMullin Hudson were now living and plaintiff here, I think she would undoubtedly be held guilty

of laches in respect to any action taken by her based on the charges above recited. And, by the weight of sound authority, her descendant is barred by that fact. 21 C. J. 216; Halsey v. Cheney (C. C. A.) 68 F. 763.

Plaintiff makes a vague reference to the United States topographical and geological maps of Kanawha county, alleging by implication that these were not in existence during her mother's lifetime; but she does not allege what is shown by these maps, nor does she point out any fact disclosed by them which would not have been disclosed by the sources of information available to her mother.

The plaintiff's justification as to her own delay in bringing suit is that she has resided outside of the state since childhood and knew nothing of the matters now complained of until she heard of the previous suits (McMullen v. Lewis and Morse v. Lewis) brought by her cousins. I am inclined to think that this admission alone indicates laches on the part of the plaintiff, or at least that it involves the closely related principle frequently expressed in the broad language that equity will not permit a suit to be maintained where it is inequitable to do so. The plaintiffs in each of the other suits were first cousins of the plaintiff here. The interests of these three persons are identical; the subject-matter of the three suits and their purpose is identical. This plaintiff might have joined in either of those suits, and even if she did not, a successful outcome in either of the previous suits would have redounded to her benefit. Instead of joining therein and seeking a prompt vindication of her alleged rights, as good faith would seem to demand, she refrained from coming into court at that time, but reserved her right and opportunity to assert her claims in case the attempt of her cousins to assert identical claims should be unsuccessful; while at the same time she stood to win equally with her cousins in case either of them were successful. In reality, this plaintiff, as well as both of her cousins, have had three bites at the same cherry. Equity does not look with favor on such procedure.

However, it is not upon this ground, but for the reasons previously stated, that I think the doctrine of laches plainly applicable to this case. The facts sustaining the defense of laches are here stronger than in either McMullen v. Lewis or Morse v. Lewis, in both of which this defense was upheld.

Plaintiff, in justifying her right to maintain this suit after the lapse of years, sets forth in her bill and relies upon a provision of the West Virginia Code (1931), section 17 of article 2 of chapter 55, as follows: "Where any such right as is mentioned in this article shall accrue against a person who had before resided in this State, if such person shall, by departing without the same, or by absconding or concealing himself, or by any other indirect ways or means, obstruct the prosecution of such right, * * * the time that such obstruction may have continued shall not be computed as any part of the time within which the said right might or ought to have been prosecuted."

Plaintiff then alleges that upon the entry of the judgments complained of, a right of action accrued to her mother and to her, and that this right has ever since existed; and she avers her reliance upon the above-quoted statute in preservation of this right.

The theory of the plaintiff is that a fraud was perpetrated by defendants or their predecessors whereby they obtained the lands in question. That this fraud was concealed from plaintiff and her predecessors and that by this concealment the defendants "obstructed the prosecution" of the rights of plaintiff, within the meaning of the statute quoted. That, by the terms of the statute, the right of the plaintiff to sue was held in suspension or extended so long as the defendants continued to obstruct the prosecution of plaintiff's rights; that is, continued to conceal the fraud; that plaintiff could not be held in fault in not suing until she learned of the fraud, or, in other words, until the obstruction caused by defendants' concealment ceased to exist.

There is cited in connection with this statute the case of Newberger v. Wells, 51 W. Va. 624, 42 S. E. 625. The quoted statute relates to the operation of the statute of limitations; it is in that chapter of the West Virginia Code dealing with that subject. The case of Newberger v. Wells contains a lengthy and learned discussion of the applicability of the statute of limitations to suits based on fraud and the applicability to such cases of the statute now invoked. It expresses the view that the "obstruction" to the prosecution of plaintiff's right referred to in the statute as justifying the postponement of the running of the period of limitation need not necessarily be some affirmative act by the defendant separate and distinct from the original cause of action and arising there-

after. That in cases where the basis of action is the original fraud of the defendants and is known only to the defendants and is incapable of discovery by the plaintiffs in the exercise of due diligence, then silence on the part of the defendants is regarded as a continuation of the original fraud and as constituting a fraudulent concealment. Says the court, page 634 of 51 W. Va., 42 S. E. 625, 629: "In this way, causes of action arising out of fraud by the defendant rest upon the same footing, so far as the rule under consideration is concerned, as other causes of action not arising from fraud, but which have been concealed by fraud. In either case the statute begins to run only from the time when the wrong of which the plaintiff complains was or ought to have been discovered by him."

The court there was dealing with the applicability of the statute of limitations. Without attempting further analysis of the opinion, it is sufficient to say that it held the view that where a fraud has been perpetrated, knowledge of which is with the defendants alone and they keep silent and the fraud is such that the plaintiff could not have discovered it in the exercise of due diligence, the statute of limitations will not begin to run against the plaintiff until he acquired knowledge of the fraud. I think there is nothing in this view contrary to that generally held. I do not think it applicable to the facts of the instant case.

Indeed, in the case discussed (Newberger v. Wells), the court, after discussing the above principles, held that the allegations of the bill were not such as to make them applicable and affirmed a dismissal of the bill on the ground that laches was apparent on the face of it. The court said that where ignorance of rights is relied on to excuse laches, the plaintiff must show why he was so long in ignorance and the means used to keep him so. He must allege the reasons why he could not, in the exercise of due diligence, have obtained knowledge of his rights, and if alleging that the prosecution of his rights, in the language of the statute, had been obstructed, he must specify the means of obstruction, the particular acts whereby it was accomplished.

Having heretofore indicated the view that laches was apparent on the face of the bill, particularly as evidenced by the inaction of Mary McMullin Hudson during her lifetime; there is nothing in the cited statute nor in the decision in Newberger v. Wells which changes the effect of that conclusion.

## The Amended Bill.

Following argument on the motion to dismiss the original bill, the plaintiff filed an amended bill. The evident purpose of the amended bill was to differentiate this case from McMullen v. Lewis and Morse v. Lewis. The amended bill reasserts that the original grant to Skiles was void for uncertainty, that the boundaries recited therein never in fact existed, and that therefore title to the land never in fact left the state of Virginia, notwithstanding the purported grant to Skiles. That when the commissioners of delinquent and forfeited lands later undertook to sell the Skiles land for nonpayment of taxes, such sale was null and void for the reason that title to the land remained in the state and therefore no taxes could be or were due thereon. That the pretended sale by the commissioners conferred no right or title in John D. Lewis to these lands, which were waste and unappropriated lands belonging to the state. The plaintiff then alleges that the grants of these lands to Wm. A. McMullin and John P. Hale were original grants from the state and were good and valid and conferred title in McMullin and Hale, and that the plaintiff, as an heir at law of William A. McMullin, now owns and has the legal title to an undivided one-fourth interest in said lands. She then quotes the West Virginia statute, Code of 1931, c. 51, art. 2, § 2, as follows: "Courts of chancery shall have jurisdiction at the suit of the owner of real property or any part thereof, or any estate, right or interest therein * * * to set aside any cloud on the title thereof and to determine questions of title with respect thereto, without requiring such owner to allege or prove actual possession of the same." She then asserts that: "By virtue of said statute she has a cause of action against the defendants herein and each of them, in that said defendants, and each of them, set up claims to said lands against plaintiff's rights therein."

The amended bill alleges further that the ejectment suit No. 6, in which Lewis was plaintiff, involved 40,000 acres of land involved in the so-called Skiles survey and no other land. But that in making the award in suit No. 6, "the arbitrators purported to award Lewis 40,000 acres of different land than that mentioned in the declaration as being the so-called Skiles land, and 12,000 acres in addition thereto * * * making a total of 52,000 acres awarded to said Lewis. * * * That said additional 12,000 acres was owned by William A. McMullin and John P. Hale"; that the award was not

responsive to the declaration and that by reason thereof the children of William A. McMullin were illegally deprived of the possession of 30,000 acres of land as set out in the original bill, this being all of their lands known as the Skiles lands including said 12,000 acres.

This amended bill then concludes with a prayer "as in her original bill of complaint herein, and further that her title to said lands be quieted, that the defendants and each of them be required to release to plaintiff all claims in and to her interest therein," and for general relief.

The amended bill is confusing. Some of its allegations are a repetition of those in the original bill and it refers to allegations of the original bill, while it also appears to be an attempt to secure relief from an entirely different standpoint, namely, that of removing a cloud from the title. That its tender was with this latter purpose is now apparent, for in plaintiff's brief on the motion to dismiss the amended bill, her counsel state that "the amended bill herein filed abundantly and convincingly states an entirely new and different cause of action."

 Liberality should be exercised in allowing amendments to pleadings and the terms of Equity Rule 26 (28 USCA § 723) are broad and comprehensive; but I doubt that any justification can be found for permitting a bill seeking the specific remedy of cancelling the judgment of a court on the ground of fraud to be amended into one seeking to remove a cloud from the title to land, while at the same time retaining the purpose, the allegations, and the prayer of the original bill. The remedies sought are on widely different theories, are incongruous and contradictory. The theory of the original bill is that plaintiff has lost title to the land through judgments obtained in ejectment suits, and seeks the cancellation of these judgments on the ground that they were obtained by fraud. The amended bill involves the theory that plaintiff has legal title to the land, and that some instrument or record is a cloud on the title of plaintiff and should be cleared away.

 However, aside from this, the amended bill, in my opinion, will not stand for a variety of reasons. One deficiency in it is that it does not point out the instrument or record which constitutes the cloud upon the title; the allegations of the bill are not sufficiently definite or clear for the entry of any decree based on them. But there are still broader objections, involving the right of the plaintiff to maintain any such action as attempted in the amended bill; and these objections, I think, cannot be overcome.

 The theory of the suit to remove cloud from title is that an owner of real estate whose title is beclouded by instruments or records constituting a semblance of title or a claim of right in another, which are in fact invalid or the enforcement of which would be inequitable, may have his title cleared and quieted by a decree cancelling and avoiding the offending instruments or prohibiting the claim of any right under them. Or, as said in Whitehouse v. Jones, 60 W. Va. 680, 55 S. E. 730, 734, 12 L. R. A. (N. S.) 49: "The old principle, vindicated by time, necessity, and reason, that one in possession may appeal to the equity court to save his superior title from harm by any claim, pretense of title, or other steps by one who has no title, but who is casting cloud and doubt on his title."

Originally the suit could not be maintained unless the plaintiff had both the legal title and the possession. "To successfully maintain the bill the plaintiff must have both actual possession and superior title—that is, the best title." Whitehouse v. Jones, supra.

 The term "legal title" has no absolute or strict legal meaning. At times it is used to mean full and absolute title; at other times (a frequent use) it is used to indicate that condition where there is an apparent right of ownership in property but where the beneficial interest (the equitable title) is in another. It is not necessarily the record title, for legal title may be acquired by possession.

 But under any definition, I think it apparent that the plaintiff has not such title as to permit her to maintain a suit for removal of cloud upon the title. Nor is the plaintiff in possession of the property. By the very averments of her original bill she (or her ancestors) has been divested of all title as a result of the judgments entered in the ejectment suits. She has no record title to the property, no title which gives her the apparent right of ownership and possession, and no title by possession.

 The rule requiring legal title to be in the plaintiff has been relaxed in many instances, due in most part to statutory provisions, and in some circumstances a suit to remove cloud may be maintained by the owner of an equitable title. But I think that no case will be found where a federal court

has approved the maintenance of a suit by such a plaintiff out of possession against a defendant in possession, where, the defendant exercises ownership by virtue both of his possession and of his muniments of title. A sound reason therefor is that under such conditions the plaintiff has an adequate remedy at law by an action of ejectment.

It is to be doubted that the West Virginia statute relied on by plaintiff was ever meant to furnish a substitute for ejectment or to be a means whereby, under all circumstances, the title to real estate might be tried by a suit in equity alleging cloud upon the title.

The statute limits the exercise of the right to the "owner" of the property and not to "any claimant"; or to "one claiming title." It also provides for the exercise of the right by a plaintiff who may not be in actual possession, but fails specifically to state that the suit may be against a defendant who *is in possession*. All of which would indicate that the traditional requisites for maintenance of a suit to quiet title are changed only to the extent that the plaintiff need not be in actual possession of the property, and that the statute is not intended as a means whereby trial of the title to land may be had under any and all circumstances. However, it is not necessary to pursue the interpretation of this statutory provision, for, whatever its meaning, it could not be applied in this court to contravene the rule that equity will not exercise jurisdiction where there is an adequate remedy at law—a rule rigidly adhered to in the federal courts and specifically declared by federal statute (USCA title 28, § 384).

The following quotations from two cases decided by the Supreme Court well sum up the law applicable to the situation here. The first relates to the general principles applicable. Frost v. Spitley, 121 U. S. 552, at pages 556, 557, 7 S. Ct. 1129, 1131, 30 L. Ed. 1010, where it is said:

"Under the jurisdiction and practice in equity, independently of statute, the object of a bill to remove a cloud upon title, and to quiet the possession of real estate, is to protect the owner of the legal title from being disturbed in his possession, or harassed by suits in regard to that title; and the bill cannot be maintained without clear proof of both possession and legal title in the plaintiff. Alexander v. Pendleton, 8 Cranch, 462 [3 L. Ed. 624]; Peirsoll v. Elliott, 6 Pet. 95 [8 L. Ed. 332]; Orton v. Smith, 18 How. 263 [15 L. Ed. 363]; Crews v. Burcham, 1 Black, 352 [17 L. Ed. 91]; Ward v. Chamberlain, 2 Black, 430 [17 L. Ed. 319]. As observed by Mr. Justice Grier in Orton v. Smith: 'Those only who have a clear legal and equitable title to land, connected with possession, have any right to claim the interference of a court of equity to give them peace or dissipate a cloud on the title.' 18 How. 265. A person out of possession cannot maintain such a bill, whether his title is legal or equitable; for, if his title is legal, his remedy at law, by action of ejectment, is plain, adequate, and complete; and, if his title is equitable, he must acquire the legal title, and then bring ejectment. United States v. Wilson, 118 U. S. 86, 6 S. Ct. 991 [30 L. Ed. 110]; Fussell v. Gregg, 113 U. S. 550, 5 S. Ct. 631 [28 L. Ed. 993]. * * *

"In Stark v. Starrs, 6 Wall. 402 [18 L. Ed. 925], the suit was founded on a statute of Oregon, authorizing 'any person in possession' to bring the suit. The court, after observing that 'his possession must be accompanied with a claim of right, legal or equitable,' held that the plaintiff proved neither legal nor equitable title; and consequently the question whether an equitable title only would have been sufficient to maintain the suit was not adjudged. In Reynolds v. Crawfordsville Bank, 112 U. S. 405, 5 S. Ct. 213 [28 L. Ed. 733], the decision was based upon a statute of Indiana, under which, as construed by the supreme court of that state, an equitable title was sufficient either to support or to defeat the suit. Jeffersonville Railroad Co. v. Oyler, 60 Ind. 383; Burt v. Bowles, 69 Ind. 1. See, also, Grissom v. Moore, 106 Ind. 296, 6 N. E. 629 [55 Am. Rep. 742].

"A statute of Nebraska authorizes an action to be brought 'by any person or persons, whether in actual possession or not, claiming title to real estate, against any person or persons who claim an adverse estate or interest therein, for the purpose of determining such estate or interest, and quieting the title to said real estate.' St. Neb. Feb. 24, 1873; Gen. St. 1873, p. 882. By reason of that statute, a bill in equity to quiet title may be maintained in the circuit court of the United States for the district of Nebraska by a person not in possession, if the controversy is one in which a court of equity alone can afford the relief prayed for. Holland v. Challen, 110 U. S. 15, 25, 3 S. Ct. 495 [28 L. Ed. 52]. The requisite of the plaintiff's possession is thus dispensed with, but not the other rules which govern the jurisdiction of courts of equity over such

bills. Under that statute, as under the general jurisdiction in equity, it is 'the title'—that is to say, the legal title—to real estate that is to be quieted against claims of adverse estates or interests. In State v. Sioux City & Pacific Railroad, the supreme court of Nebraska said: 'Whatever the rule may be as to a party in actual possession, it is clear that a party not in possession must possess the legal title in order to maintain the action.' 7 Neb. 357, 376. And in Holland v. Challen, above cited, this court said: 'Undoubtedly, as a foundation for the relief sought, the plaintiff must show that he has a legal title to the premises.' "

The second case deals specifically with the applicability of a state statute. See Whitehead v. Shattuck, 138 U. S. 146, 11 S. Ct. 276, 34 L. Ed. 873. In this case, the facts as alleged by the plaintiff were so similar to those alleged in the instant case that I quote first the statement of these facts:

"The bill alleges that the plaintiff is the owner in fee of the premises, but holds the title as trustee aforesaid; that notwithstanding his ownership of the property, and his right to its immediate possession and enjoyment, the defendants claim title to it, and are in its possession, holding the same openly and adversely to him; that their claim of title and right of possession are founded upon a pre-emption and homestead claim and entry thereunder, made in the United States land-office, a certificate of such entry given by that office, and a patent issued by the land department of the United States of the land as subject to entry; and also upon a subsequent deed of the Iowa Homestead Company, the grantee of the Dubuque & Sioux City Railroad Company, which latter company claimed title under the act of congress of May, 1856, making a grant of land to Iowa to aid in the construction of certain railroads in that state, and a certificate of the proper officer of the land department of the United States setting apart the lands to that company as a portion of the grant.

"The bill charges that the claim and pretended title of the defendants are without foundation in law or equity; that they are made in fraud of the rights of the plaintiff; that the pre-emption and homestead claim, and entry thereunder, and the certificate of entry of the land-office, and the patent of the United States, were fraudulently made, giving as a reason therefor that the land thus entered and patented was not at the time subject to entry and patent, and that the deed of the Iowa Homestead Company conveyed no title, for the reason alleged that the land was no part of the grant to the state; and that these evidences of title were procured without legal right, and in violation of law, but are clouds upon the plaintiff's title, and interfere with and prevent the sale of his property. He therefore prays that the certificate of entry, and the patent of the land, and the certificate of the land department that the land was a part of the grant to the state of Iowa, and the deed of the homestead company, may be annulled and canceled, and the cloud upon his title caused thereby removed, and the title to the premises be established and quieted in him."

The following is from the opinion by Mr. Justice Field:

"The facts set forth in the bill of the plaintiff clearly show that he has a plain, adequate, and complete remedy at law for the injuries of which he complains. He alleges that he is the owner in fee, as trustee, of certain described lands in Iowa, and his injuries consist in this: that the defendants are in the possession and enjoyment of the property, claiming title under certain documents purporting to transfer the same, which are fraudulent and void. If the owner in fee of the premises, he can establish that fact in an action at law, and if the evidences of the defendants' asserted title are fraudulent and void, that fact he can also show. There is no occasion for resort to a court of equity, either to establish his right to the land or to put him in possession thereof.

"The sixteenth section of the judiciary act of 1789 (1 St. 82 [see 28 USCA § 384]) declared 'that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate, and complete remedy may be had at law,' and this provision has been carried into the Revised Statutes, in section 723. The provision is merely declaratory, making no alteration whatever in the rules of equity on the subject of legal remedies, but only expressive of the law which has governed proceedings in equity ever since their adoption in the courts of England. * * *

"What we have thus said will be sufficient to dispose of this case, but some consideration is due to the arguments of counsel founded upon the statutes of Iowa, and the principle supposed to have been established by this court. in the decision of the case of Holland v. Challen, 110 U. S. 15, 3 S. Ct. 495 [28 L. Ed. 52], upon which the plaintiff relies.

"The Code of Iowa enacts that 'an action to determine and quiet the title to real property may be brought by any one having or claiming an interest therein, whether in or out of possession of the same, against any person claiming title thereto, though not in possession,' implying that the action may be brought against one in possession of the property. And such has been the construction of the provision by the courts of that state. Lewis v. Soule, 52 Iowa, 11, 2 N. W. 400; Lees v. Wetmore, 58 Iowa, 170, 12 N. W. 238. If that be its meaning, an action like the present can be maintained in the courts of that state, where equitable and legal remedies are enforced by the same system of procedure, and by the same tribunals. It thus enlarges the powers of a court of equity, as exercised in the state courts, but the law of that state cannot control the proceedings in the federal courts, so as to do away with the force of the law of congress declaring that 'suits in equity shall not be sustained in either of the courts of the United States, in any case where a plain, adequate, and complete remedy may be had at law,' or the constitutional right of parties in actions at law to a trial by a jury."

 One further reason exists against entertaining the amended bill, a reason sufficient in itself. Laches of the plaintiff has been heretofore discussed, and the plaintiff's fault in this particular is equally applicable and equally fatal to her right to maintain such a case as she seeks to make in her amended bill. Indeed, as to the grounds of action set out in the amended bill, it is my opinion that laches is evident more clearly and more inexcusably than appeared in the original bill. In the original bill, it was sought to excuse the delay upon the ground that the fraud complained of had been impossible of discovery until recent years. In the amended bill, if I understand rightly, the basis of the remedy sought is that the sale of the Skiles land made by the commissioners of delinquent and forfeited lands in 1841 was void, that it passed no title to Lewis, and that the conveyance to Lewis and subsequent conveyances are clouds upon the title which McMullin and Hale acquired. There is no allegation here of inability to discover the situation. There could not be, for the sale of the Skiles lands and their sale and conveyance to Lewis were matters of public record. All of this was known to Wm. A. McMullin and to his heirs at and before the time of the ejectment suits and ever since. The land has passed into the hands of numerous parties who have developed and improved it and are in possession of it. To allow the plaintiff now to say that a conveyance of which she and her ancestors have known for 60 or 70 years, and under which present occupants of the land claim, is void and a cloud upon her title, would be most inequitable. Under the facts here laches may be invoked in a suit to remove cloud as well as it may be elsewhere.

It is to be seen that there are several grounds upon which this suit should be dismissed, any one of which would be sufficient. But I have thought it best to discuss the various phases of the cases. I realize that this has caused this opinion to be extended to undue length. But the involved nature of the bill, the variety of questions raised, and the relation of this case to the cases of McMullen v. Lewis and Morse v. Lewis made it necessary to enter into this prolonged discussion.

It follows from what has been said that both the original and the amended bill must be dismissed.

 There is one matter remaining to be disposed of. There were a large number of defendants named in this suit. Many of them appeared, filing their motions to dismiss, as hereinbefore set out. Some of the defendants have not entered an appearance of record. Against these latter a decree pro confesso went as provided in Equity Rule 16 (28 USCA § 723). Thereafter, and while the court has had under consideration the motion to dismiss, complainant moved the court to enter a final decree against the nonappearing defendants (Equity Rule 17 [28 USCA 723]). The court declined to grant the motion and withheld action thereon pending disposition of the motion to dismiss the bill; the thought in mind being that an obviously incongruous situation would be created if final judgment were given against some of the defendants upon the bill and the court should thereafter hold the same bill insufficient and dismiss it as to other defendants whose situation and interest was the same as those who had not appeared. I find justification for this course in the case of Frow v. De La Vega, 15 Wall. 552, 554, 21 L. Ed. 60.

In that case a suit was brought against a number of defendants charging a joint conspiracy to defraud the complainant out of a tract of land. All defendants except Frow answered. As to Frow a decree pro

confesso was taken and thereafter, on· application of the complainant, the court entered a final decree absolute against Frow adjudging the title of the land to be in complainant. After this final decree against Frow the court tried the issues made by the answers of the other defendants and decided the merits of the case adversely to complainant and dismissed the bill. Of this procedure the court (Mr. Justice Bradley) says:

"If the court in such a case as this can lawfully make a final decree against one de-·fendant separately, on the merits, while the cause was proceeding undetermined against the others, then this absurdity might follow: there might be one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill. And such an incongruity, it seems, did actually occur in this case. Such a state of things is unseemly and absurd, as well as unauthorized by law.

"The true mode of proceeding where a bill makes a joint charge against several defendants, and one of them makes default, is simply to enter a default and a formal decree pro confesso against him, and proceed with the cause upon the answers of the other defendants. The defaulting defendant has merely lost his standing in court. He will not be entitled to service of notices in the cause, nor to appear in it in any way. He can adduce no evidence, he cannot be heard at the final hearing. But if the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all. But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal."

See, also, American Coat Pad Co. v. Phœnix Pad Co. (C. C. A. 4th Cir.) 113 F. 629, 633, where it is said that if one defendant has permitted a decree pro confesso to be entered against him and another defendant answers and sets up an available defense, such defense will inure to the benefit of both defendants.

Therefore, the bill must be dismissed as to all defendants.